**FRISCHER & CO., Inc., et al. v. BAKELITE CORPORATION et al.**

No. 3009.

Court of Customs and Patent Appeals.

April 10, 1930.

GARRETT, Associate Judge. dissenting.

Meyer Kraushaar and W. Lee Helms, both of New York City, for appellants.

Barnes, McKenna & Halstead, of New York City (Albert MacC. Barnes, Jr., Maxwell Barus, and Samuel M. Richardson, all of New York City, of counsel), for appellees.

James W. Bevans, of New York City, amicus curiæ.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, and GARRETT, Associate Judges.

GRAHAM, Presiding Judge.

This matter comes to this court on appeal from the United States Tariff Commission under the provisions of section 316 of the

Tariff Act of 1922, 42 Stat. 858, 943 (19 USCA §§ 174–180).

On December 16, 1925, Bakelite Corporation, a corporation organized under the laws of the state of Delaware, Abse Bros., a copartnership, with its principal place of business in New York, and the Embed Art Corporation, a corporation organized under the laws of the state of New Jersey, filed with the United States Tariff Commission a complaint, under oath, asking relief under said section 316 from unfair competition in the importation and sale of beads and others materials or articles made of synthetic phenolic resin, or Bakelite.

On April 10, 1926, certain manufacturers of cigar and cigarette holders, to wit, Kaufmann Bros. & Bonde, of New York, Reiss-Premier Pipe Company, of Union City, N. J., S. M. Frank & Co., Inc., of New York, Wm. Demuth & Co., of New York, L. & H. Stern, Inc., of Brooklyn, and M. Linkman & Co., of Chicago, petitioned for leave to join in said complaint, and that any order made therein might cover and apply to cigar and cigarette holders made of synthetic phenolic resin. On April 16, 1926, the said Commission set the several matters mentioned in said application for hearing on May 24, 1926, and gave public notice of said hearing. On the same day the said Commission reported to the President and recommended that, pending completion of the investigation, the articles complained of be forbidden entry, in accordance with the provisions of said section 316, subsection (f), 19 USCA § 179.

On April 22, 1926, the President issued an order, which was duly circulated to the collectors of customs under date of April 24, 1926, directing that synthetic phenolic resin of Form C, and all articles manufactured wholly or in part thereof, except articles made by molding synthetic phenolic resin when mixed with other articles, be forbidden entry into the United States. Thereafter, on April 26, 1926, the Secretary of the Treasury, in pursuance of the provisions of said statute, instructed the various collectors of customs to the same effect. T. D. 41512, 49 Treas. Dec. 715. On May 12, 1926, Frischer & Co. Inc., a corporation organized under the laws of the state of New York, Richard Ganz, doing business as Randes Import Company, of New York, Transatlantic Watch & Clock Co., Inc., a corporation organized under the laws of the state of New York, and Western Briar Pipe Company, a corporation organized under the laws of the state of Illinois, appeared and filed their joint and several answer to the foregoing complaint, in and by which answer the right of the complainants to the relief or any part thereof prayed by them was denied. In connection with this answer various sworn statements were filed. Said answer also contained a motion that the said order of the President declaring a temporary embargo upon synthetic phenolic resin and products be rescinded and dissolved. That portion of the answer consisting of said motion was set for hearing before said Commission on May 17, 1926, and on that date was duly heard. The motion was thereafter, on May 24, 1926, taken under advisement until the decision of the matter on the merits. This hearing on the merits began on May 24, 1926, and continued thereafter, from time to time, until it was completed.

The complaint was based, in part, upon the alleged violation of certain patent rights involved in United States letters patent Nos. 942,700 and 942,809, both of which were issued to Leo H. Baekeland on December 7, 1909, and which were owned by Bakelite Corporation at the time of the filing of the complaint with said Commission.

On December 2, 1926, the said Commission reported to the President that the said patents would expire on December 6, 1926, and recommended that the temporary order of exclusion be modified to take effect at that time. On December 7, 1926, by direction of the President, the Secretary of the Treasury instructed customs officers to exclude, after December 6, 1926, "only products composed of different colored sections of synthetic phenolic resin of Form C (except articles made by molding synthetic phenolic resin when mixed with other materials) joined together by applying a fusible phenolic condensation product to the surfaces to be joined, which fusible product has been converted to the infusible state by means of heat or heat and pressure." T. D. 41895, 50 Treas. Dec. 519.

On December 18, 1926, respondents filed a motion that the proceedings be dismissed, or, in the alternative, that they be reopened for the taking of further evidence with respect to United States patent 1,424,738. This patent was issued August 1, 1922, to Lawrence V. Redman, Archie J. Weith, and Frank P. Brock, and at the time of said hearing was the property of Bakelite Corporation. It appears from the record a very extended litigation had occurred between the patentees and the General Bakelite Company, which litigation had resulted in a combination of the Condensite Company, the Red-

manol Chemical Products Company, and the General Bakelite Company into Bakelite Corporation, which operated under various patents, among which were said patents 942,700, 942,809, and 1,424,738. A decision on the motion to dismiss was reserved until a hearing on the merits was had and the alternative motion for an additional hearing was allowed, which hearing was duly had on February 11, 1927, continuing until the same was completed. In ordering said hearing, the said Commission included therein the question of unfair methods of competition, or unfair acts by way of infringement of United States trade-marks Nos. 75,266 and 170,-772, as well as of said patent No. 1,424,738.

The first of said trade-mark registrations was made on September 14, 1909, by Leo H. Baekeland and consisted of the word "Bakelite," and was applied to condensation products of phenol and formaldehyde. The second was made July 24, 1923, and consisted also of the word "Bakelite" and was applied to pipes and pipe parts, namely, mouthpieces and bits and bowl parts, and cigar and cigarette holders. These trade-marks were also owned by Bakelite Corporation at the time of these proceedings.

On May 25, 1927, the said Commission filed and made public its decision, said decision consisting of three parts: First, a general discussion of the law and facts involved in the controversy; second, findings of law and fact; and, third, three recommendations to the President as to action which might be taken by him in the premises. This report was signed by Commissioner Thomas O. Marvin, Chairman, and by Alfred P. Dennis, Vice Chairman, and E. B. Brossard, Commissioner. Appended thereto was the following notation: "Commissioner Dixon concurs in Recommendation No. 3; and dissents from the findings as to Patents No. 942,809 and No. 1,424,738, and from Recommendations No. 1 and 2 above, as he doubts the jurisdiction of the Tariff Commission to determine the validity of contested patents which are involved in said findings and recommendations." Commissioner Costigan dissented. The court will take judicial notice that at the time said report was made the said Commission consisted of six members, the sixth member being Sherman J. Lowell. Nothing appears in the record as to whether Commissioner Lowell participated in the said decision, findings, and recommendations except as hereinafter stated. His name is not attached to any of the papers.

On July 13, 1927, the respondents filed their petition for review and made 35 assignments of error which will be more fully referred to hereinafter.

On December 14, 1927, Bakelite Corporation and the other original complainants filed herein their motion for a dismissal of said appeal, stating as grounds therefor two propositions, viz.: First, that the United States Court of Customs Appeals was and is an inferior, constitutional court, created by Congress and existing under and by virtue of article 3 of the Constitution; second, that the various matters and things involved in said appeal were administrative only, did not constitute a case or controversy, and that hence this court had no jurisdiction thereof.

This motion came on for hearing before this court, and on May 25, 1928, we entered an order denying said motion. In re Frischer & Co., Inc., et al., 16 Ct. Cust. App. 191, T. D. 42827. The grounds of denial, as stated in the opinion of the court here, were, briefly, that the United States Court of Customs Appeals was and is an inferior constitutional court, as contended, but that the matters involved in the proceedings before the United States Tariff Commission, under said section 316 (19 USCA §§ 174–180), constitute a case or controversy, and that therefore there seemed to be no constitutional objection to the jurisdiction of this court in that respect.

Thereupon the Bakelite Corporation and the other complainants filed their petition for a writ of certiorari in the Supreme Court. This writ was denied October 29, 1928. Bakelite Corporation v. Frisher & Co., 278 U. S. 641, 49 S. Ct. 36, 73 L. Ed. 556. Bakelite Corporation, also, at about the same time, filed in the Supreme Court its petition for a writ of prohibition. After a return thereto this matter came on to be heard and the petition was denied May 20, 1929. Ex parte Bakelite Corporation, 279 U. S. 438, 49 S. Ct. 411, 417, 73 L. Ed. 789. The Supreme Court, in denying the writ of prohibition, did so upon the theory that the United States Court of Customs Appeals was and is a legislative court and not one created under article 3 of the Constitution, and that therefore there could be no constitutional objection to the jurisdiction of this court over matters of an administrative nature. In finally disposing of the matter, the court did so in these words: "As it is plain that the Court of Customs Appeals is a legislative and not a constitutional court, there is no need for now

inquiring whether the proceeding under section 316 of the Tariff Act of 1922, now pending before it, is a case or controversy within the meaning of section 2 of article 3 of the Constitution, for this section applies only to constitutional courts. Even if the proceeding is not such a case or controversy, the Court of Customs Appeals, being a legislative court, may be invested with jurisdiction of it, as is done by section 316."

Section 316 (19 USCA §§ 174–180), under which these proceedings are had, appears in a marginal note.[1]

■ Our attention is first called to a constitutional question. It is maintained by the respondents that said section 316 is invalid because it is an attempted delegation to the President of the legislative power which is granted to the Congress by section 8 of ar-

---

[1] "Sec. 316. (a) That unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are hereby declared unlawful, and when found by the President to exist shall be dealt with, in addition to any other provisions of law, as hereinafter provided.

"(b) That to assist the President in making any decisions under this section the United States Tariff Commission is hereby authorized to investigate any alleged violation hereof on complaint under oath or upon its initiative.

"(c) That the commission shall make such investigation under and in accordance with such rules as it may promulgate and give such notice and afford such hearing, and when deemed proper by the commission such rehearing with opportunity to offer evidence, oral or written, as it may deem sufficient for a full presentation of the facts involved in such investigation; that the testimony in every such investigation shall be reduced to writing, and a transcript thereof with the findings and recommendation of the commission shall be the official record of the proceedings and findings in the case, and in any case where the findings in such investigation show a violation of this section, a copy of the findings shall be promptly mailed or delivered to the importer or consignee of such articles; that such findings, if supported by evidence, shall be conclusive, except that a rehearing may be granted by the commission, and except that, within such time after said findings are made and in such manner as appeals may be taken from decisions of the United States Board of General Appraisers, an appeal may be taken from said findings upon a question or questions of law only to the United States Court of Customs Appeals by the importer or consignee of such articles; that if it shall be shown to the satisfaction of said court that further evidence should be taken, and that there were reasonable grounds for the failure to adduce such evidence in the proceedings before the commission, said court may order such additional evidence to be taken before the commission in such manner and upon such terms and conditions as to the court may seem proper; that the commission may modify its findings as to the facts or make new findings by reason of additional evidence, which, if supported by the evidence, shall be conclusive as to the facts except that within such time and in such manner an appeal may be taken as aforesaid upon a question or questions of law only; that the judgment of said court shall be final, except that the same shall be subject to review by the United States Supreme Court upon certiorari applied for within three months after such judgment of the United States Court of Customs Appeals.

"(d) That the final findings of the commission shall be transmitted with the record to the President.

"(e) That whenever the existence of any such unfair method or act shall be established to the satisfaction of the President he shall determine the rate of additional duty, not exceeding 50 nor less than 10 per centum of the value of such articles as defined in section 402 of Title IV of this Act, which will offset such method or act, and which is hereby imposed upon articles imported in violation of this Act, or, in what he shall be satisfied and find are extreme cases of unfair methods or acts as aforesaid, he shall direct that such articles as he shall deem the interests of the United States shall require, imported by any person violating the provisions of this act, shall be excluded from entry into the United States, and upon information of such action by the President, the Secretary of the Treasury shall, through the proper officers, assess such additional duties or refuse such entry; and that the decision of the President shall be conclusive.

"(f) That whenever the President has reason to believe that any article is offered or sought to be offered for entry into the United States in violation of this section but has not information sufficient to satisfy him thereof, the Secretary of the Treasury shall, upon his request in writing, forbid entry thereof until such investigation as the President may deem necessary shall be completed: Provided, That the Secretary of the Treasury may permit entry under bond upon such conditions and penalties as he may deem adequate.

"(g) That any additional duty or any refusal of entry under this section shall continue in effect until the President shall find and instruct the Secretary of the Treasury that the conditions which led to the assessment of such additional duty or refusal of entry no longer exist."

ticle 1 of the Constitution: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises.  *  *  *"

This point has very recently and closely engaged the attention of this court in Hampton, Jr., & Co. v. United States, 14 Ct. Cust. App. 350, T. D. 42030. In that case, the President had issued a proclamation increasing the duties upon barium dioxide, under and by virtue of the provisions of section 315, Tariff Act of 1922, 42 Stat. 858, 941 (19 USCA §§ 154–159). The validity of the section was challenged as an unconstitutional delegation of legislative authority to the President. This contention was found to be without merit and the statute was upheld. A writ of certiorari having been granted by the Supreme Court, the judgment of this court was affirmed. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 352, 72 L. Ed. 624.

Section 315, under consideration in the Hampton Case, supra, attempts to provide a remedy in cases where it is impossible for articles wholly or in part the growth or product of the United States to compete with similar articles or products from foreign countries, because of differences in costs of production. In such cases the statute provides that when the President "shall find it thereby shown that the duties fixed in this Act do not equalize the said differences in costs of production in the United States and the principal competing country," he shall ascertain said differences and proclaim increases or decreases in the duties in order to equalize said differences in cost of production. He is also authorized by the statute, in case he shall find that such equalization cannot be made by increasing or decreasing the duties as specified, to proclaim the same and cause said imported articles to be valued upon their American selling price, within certain limitations. The statute further provides that certain elements may be taken into account by the President in making his findings, and that investigations to assist the President in ascertaining differences of costs of production shall be made by the United States Tariff Commission, and that no proclamation can be made thereunder until such investigation shall have been made. The section further provides that when the President determines that it is shown that the differences in costs of production have changed or no longer exist, he shall modify or terminate his former order.

Section 316, in pari materia with section 315, is likewise intended to protect American industries and to further and promote the protection of domestic goods. An analysis of this section discloses that it provides that unfair methods of competition and unfair acts in the importation of articles into the United States, which have a tendency to destroy or substantially injure economically operated industries in the United States, are unlawful. It provides that when the President shall find such unfair methods or acts to exist and they are established to his satisfaction, he shall determine the rate of duty, within certain limitations, which are necessary to offset such methods or acts, and, when he shall be satisfied and find that there are extreme cases of unfair methods or acts, he shall cause such articles to be excluded from entry into the United States. The section further provides that when the President has reason to believe that articles are being offered or sought to be offered for entry in violation of said section, but is not fully informed, he may cause a temporary embargo to be made until his investigation is completed. Such embargoes are to continue until the President shall find that the conditions existing no longer require the same, when he shall instruct the Secretary of the Treasury to discontinue the same.

In our opinion the provisions of section 316 do not constitute an attempted delegation of legislative power. Here the Congress has declared certain unfair methods and acts to be unlawful, and has further declared that when such unlawful acts are committed, certain remedies shall be applied. The statute does not provide that the President shall establish any policy, or fix any rates, or levy any embargoes. These are fixed by the statute itself and are the act of the legislative body. The President, in performing his duties, does so as a fact-finding body, and no different principle applies than that which was held to be applicable in the Hampton Case, supra.

In the Hampton Case, we went fully into the authorities on this subject, and it would be needless repetition to again cite and comment upon them here. We therefore content ourselves with a brief excerpt of what we there said in conclusion: "Viewing said section 315 in the light of these authorities and its legislative history, it at once becomes evident that the Congress has endeavored to express therein a general legislative policy. This policy is to levy upon imported products sufficient duties to equalize the differences in cost of production in the United States and the principal competing countries from which such imports come. Under ordinary circumstances, the duties are those specifical-

ly named in the act; but, whenever these are insufficient to accomplish this expressed purpose, they shall be, within certain precautionary minima and maxima, increased or decreased accordingly. There is no uncertainty here as to the congressional intent and policy; no discretion is attempted to be given to the President to determine what the policy shall be; the law imposes upon him no duties and confers upon him no powers except to execute the law, if it be capable of execution. When the President proclaims a change of rate thereunder, the new rate of duty does not come into being as a result of the proclamation, but the proclamation and the rate of duty result from the law."

In commenting on this same point, the Supreme Court, speaking through the Chief Justice, in Hampton v. United States, supra, said: "It is conceded by counsel that Congress may use executive officers in the application and enforcement of a policy declared in law by Congress and authorize such officers in the application of the congressional declaration to enforce it by regulation equivalent to law. But it is said that this never has been permitted to be done where Congress has exercised the power to levy taxes and fix customs duties. The authorities make no such distinction. The same principle that permits Congress to exercise its rate-making power in interstate commerce by declaring the rule which shall prevail in the legislative fixing of rates, and enables it to remit to a rate-making body created in accordance with its provisions the fixing of such rates, justifies a similar provision for the fixing of customs duties on imported merchandise. If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power. If it is thought wise to vary the customs duties according to changing conditions of production at home and abroad, it may authorize the Chief Executive to carry out this purpose, with the advisory assistance of a Tariff Commission appointed under congressional authority."

We are therefore of opinion that there is no valid objection to said section 316, as an unconstitutional delegation of legislative authority to the President.

█ The thirty-first assignment of error, and one much insisted upon by appellant, is as follows: "31. That the findings of the Tariff Commission are void on the ground that the same were not signed by a majority of the Commission, but only by three members thereof, and on the further ground that the said findings can only be valid if made by unanimous consent of all members of the Commission."

The United States Tariff Commission was created by the act entitled "An Act To increase the revenue, and for other purposes," approved Sept. 8, 1916, §§ 700–709, 39 Stat. 795–798 (19 USCA § 91 et seq.). That act provides, in section 700 (19 USCA § 91), for the creation of a Commission to consist of six members, to be appointed by the President and not more than three of whom shall be members of the same political party. It prescribes the duties and functions of said Commission, and provides that "a vacancy shall not impair the right of the remaining members to exercise all the duties of the commission." The act also provides, section 701 (19 USCA § 92), that the Commission may, "by one or more of its members, or by such agents as it may designate, prosecute any inquiry necessary to its duties." Nowhere in the act or its amendments is found any reference to the number of members necessary to constitute a quorum and to do business, aside from the above provisions.

The United States Tariff Commission, under the law, is not a judicial tribunal, but an administrative board. Its functions are those of a fact finding commission. United States ex rel. v. United States Tariff Com., 55 App. D. C. 366, 6 F.(2d) 491; 34 Ops. Attys. Gen. 77 (1924). In that respect it is similar to the Federal Trade Commission, which has been held to exercise only the administrative functions delegated to it by the act and to be without judicial powers. Fed. Tr. Com.. v. Eastman Kodak Co., 274 U. S. 619, 47 S. Ct. 688, 71 L. Ed. 1238.

Where a governmental body has been created by law, consisting of more than one person, whether legislative, judicial, or administrative, unless the number necessary to constitute a quorum is fixed by law, it has usually been held that a majority of the persons constituting such body shall constitute such quorum and may transact the business for which it is organized. Some jurisdictions have held to the contrary in discussing the powers of courts, but the great bulk of legal authority is as above stated. This doctrine is also subject to the further limitation that where the authority is given jointly to several persons in the matter of some private agency, these persons must act jointly or their actions are invalid. The rule is otherwise when the authority is of a public nature; in such cases the authority may be ex-

ecuted by a majority. Cooley v. O'Connor, 12 Wall. 391, 398, 20 L. Ed. 446; Cowan v. Murch, 97 Tenn. 590, 37 S. W. 393, 34 L. R. A. 538; Briscoe v. Bank, 33 U. S. (8 Pet.) 118, 8 L. Ed. 887; Austin v. Harbin, 95 Tenn. 598, 32 S. W. 628; Bank v. Mount Tabor, 52 Vt. 87, 36 Am. Rep. 734; Ex parte Rogers, 7 Cow. (N. Y.) 526; Grindley v. Barker, 1 Bos. & P. 229; Attorney General v. Davy, 2 Atk. 212; Heiskell v. Mayor, 65 Md. 125, 4 A. 116, 57 Am. Rep. 308; State v. Porter, 113 Ind. 79, 14 N. E. 883.

It is therefore apparent that four members of the Tariff Commission, or a majority, could perform any function which the entire body could perform. The query then arises: If four members can transact any of the business of the Commission, must all four concur in order to make valid findings, under the law?

It seems to us that both legal authority and reason indicate the contrary, and that a majority of a quorum is all that is necessary. Where courts are concerned, it has been uniformly held, so far as we can ascertain, that a clear majority of all the legally constituted members thereof shall concur or no valid judgment may be entered except such as may follow no decision. Mugge v. Tate, 51 Fla. 255, 41 So. 603; Deglow v. Kruse, 57 Ohio St. 434, 49 N. E. 477; Denver & R. G. R. Co. v. Burchard, 35 Colo. 539, 86 P. 749, 9 Ann. Cas. 994; Madlem's Appeal, 103 Pa. 584; Putnam v. Rees, 12 Ohio, 21; Northern R. R. v. Concord R. R., 50 N. H. 166; Johnson v. State, 1 Ga. 271; Ayers v. Bensley et al., 32 Cal. 632; Ill. Cent. R. R. Co. v. Frazier, 47 Ill. 505.

But the trend of modern authority is that in collective bodies other than courts, even though they may exercise judicial authority, a majority of a quorum is sufficient to perform the function of the body. The following authorities are in point: "But if the act is one which requires the exercise of discretion and judgment, in which case it is usually termed a judicial act, unless special provision is otherwise made, the persons to whom the authority is given, must meet and confer together, and be present when the act is performed, in which case a majority of them may perform the act; or, after all of them have been notified to meet, a majority of them having met will constitute a quorum or sufficient number to perform the act, and according to some modern authorities, the act may be legally done by the direction or with the concurrence of a majority of the quorum so assembled." Martin v. Lemon, 26 Conn. 192. Where the issue was the authority of a superintending committee of a town to act, it was held, "A major part of the whole is necessary to constitute a quorum, and a majority of such quorum may act." Damon v. Granby, 2 Pick. (Mass.) 345. In a city council where an ordinance had been passed making a two-thirds vote of the same requisite to the granting of a permit, it was held that such ordinance was invalid, and that in the absence of legislation to the contrary, a majority of a quorum could issue such permit. State v. Gitchell, 90 Vt. 57, 96 A. 383; Hutchinson v. Borough of Belmar, 61 N. J. Law, 443, 39 A. 643. When a quorum of a city council is present, a majority of that quorum can elect an officer provided for by law. Collopy v. Cloherty (Ky.) 39 S. W. 431. In the absence of statutory restriction, the general rule is that a majority of a council or board is a quorum, and the majority of the quorum can act. Merrill v. City of Lowell, 236 Mass. 463, 128 N. E. 862. Where a city council was composed of eight aldermen and a mayor, and the terms of four aldermen had expired, and where the remaining four aldermen and the mayor met, and three of them voted for a certain elective official, such election was valid. People v. Wright, 30 Colo. 439, 71 P. 365. The majority of a quorum is all that is required for the adoption or passage of any resolution or order properly arising for the action of a city council or other collective body exercising legislative, judicial, or administrative functions. Thurston v. Huston, 123 Iowa, 157, 98 N. W. 637. The two-thirds vote in each house which is required in proposing an amendment to the Constitution is a vote of two-thirds of the members present, assuming the presence of a quorum, and not a vote of two-thirds of the entire membership, present and absent. National Prohibition Cases, 253 U. S. 350, 386, 40 S. Ct. 486, 64 L. Ed. 946; M. P. Ry. Co. v. Kansas, 248 U. S. 276, 39 S. Ct. 93, 63 L. Ed. 239, 2 A. L. R. 1589.

If it be true, therefore, as contended by appellants, that but five members of the Tariff Commission participated in these proceedings and that but three of said members concurred in said findings, we conclude that such concurrence by three members is sufficient to make valid findings.

■ There is, however, no showing made by the record that Commissioner Lowell did not participate in such hearings and majority findings. The statute, section 316, Tariff Act of 1922, 42 Stat. 858, 943 (19 USCA §§ 174–180), does not require the findings of such Commission to be signed. The language is (section 316 (c), 19 USCA § 176): "That

the testimony in every such investigation shall be reduced to writing, and a transcript thereof with the findings and recommendation of the commission shall be the official record of the proceedings and findings in the case. * · * * " The fact that certain of the commissioners signed said report, and that Commissioner Lowell did not, does not, in itself, and without a showing to the contrary, prove that he did not concur in such findings. The report and findings of the Commission recite, repeatedly, that the various steps taken in this matter, and that the findings and recommendations made, are those of the Commission. There is nothing in the record to contradict this, and the presumption must be that all the members of the Commission acted. A case in point is Scott et al. v. Detroit Y. M. Soc., 1 Doug. (Mich.) 119. There the Governor and three judges were authorized to convey certain property; the deed was signed by the judges, but not by the Governor, and its validity was attacked on this ground. The court said: "In the absence of proof to the contrary, it will be presumed that the Governor was present and consulted with the Judges, touching the grant and conveyance to the Detroit Young Men's Society, of the lot in question. Where an act of public duty is enjoined, and has been performed in fact, the law will presume, unless the contrary directly appears, that everything necessary to give it validity was observed in the performance."

Announcing the same rule is Downing v. Rugar, 21 Wend. (N. Y.) 178, 34 Am. Dec. 223.

But assuming, for the sake of argument, that at least four commissioners must have concurred in the findings and that Commissioner Lowell cannot be considered as having so concurred, we believe that Commissioner Dixon, by his special concurrence, concurred in sufficient of the findings of the Commission herein which are material for the purposes of the proceeding. Commissioner Dixon's special concurrence, hereinbefore quoted, agrees to recommendation No. 3 and dissents from recommendations 1 and 2. He also does not join in the findings upon patents Nos. 942,809 and 1,424,738, because he doubts the jurisdiction of the Commission to determine the validity of these patents. The recommendations are as follows:

"It is recommended that the President direct the Secretary of the Treasury to instruct customs officers as follows:

"1. That the following named materials and articles imported prior to December 7, 1926, be excluded from entry into the United States:

"Synthetic phenolic resin, form C, and articles made wholly or in part thereof (except articles made by molding synthetic phenolic resin when mixed with other materials) containing a proportion of free or combined base not exceeding one-fifth of the equimolecular proportion of phenolic body employed as described in United States patent No. 942,809.

"2. That the following named materials and articles be excluded from entry into the United States, namely:

"Synthetic phenolic resin, form C, and articles made wholly or in part thereof (except articles made by molding synthetic phenolic resin when mixed with other materials) composed of different colored sections of synthetic phenolic resin, form C, united by a bonding agent comprising a phenolic condensation product, as described in United States patent No. 1,424,738.

"3. That the following named articles be excluded from entry into the United States, namely:

"Articles made wholly or in part of synthetic phenolic resin, form C (except articles made by molding synthetic phenolic resin when mixed with other materials), unless it is clearly and unmistakably shown by means of a distinguishing mark, name, inscription, or label, placed upon said articles or attached thereto, that said articles are not made from synthetic phenolic resin, form C, manufactured by the Bakelite Corporation, or unless said articles are otherwise reasonably distinguished so as to prevent confusion between the imported and the domestic articles on the part of the purchasing public."

The findings are twenty-five in number and are too voluminous for quotation here. It is apparent from an examination of these findings that there are, irrespective of the findings as to the validity of the patents involved, repeated findings of unfair methods of competition and unfair acts in the importation and sale of synthetic phenolic resin, form C, and articles made therefrom. Findings 7 to 13, inclusive, refer to patent No. 942,809. This patent having expired on December 6, 1926, and the President having, on that date, released the embargo on importations of products described in said patent, all questions as to said patent become moot here, and will not be further considered.

Findings 1, 2, 3, 4, 5, 6, 19, 20, 21, 22, and 23 are, plainly, findings that the respondents have been guilty of unfair practices and

are not at all based upon the validity or invalidity of the patents in question.

It having been concluded that there are before us valid findings of the Tariff Commission it becomes important to consider what these findings are, and whether they find support in the record, as a matter of law. These findings, as further expressed by the report accompanying the same, are, so far as material here, in substance, that the appellants are engaged in the importation of synthetic phenolic resin, form C, and articles made therefrom, which is and are prepared and manufactured in conformity with the method described in United States patent No. 1,424,-738, now owned by the complainant, Bakelite Corporation, and which method consists in joining together two or more different colored sections of an infusible and substantially insoluble phenolic condensation product in such manner as to become substantially homogeneous without the use of mechanical means; that Bakelite Corporation is engaged in the manufacture of these products in the United States and efficiently and economically operates the said industry; that Bakelite Corporation is also the owner of the registered trade mark "Bakelite" and uses the same upon its products; that the appellants are selling the same to jobbers and retailers in the United States at less than their American selling price and value; that the said goods have been and are commonly sold by the retailers, who purchase the same from appellants as "Bakelite"; that the articles and goods thus sold to the public have no marks upon them to indicate that they are not Bakelite, and that therefore the public is confused and purchases the imported material, thinking it to be Bakelite made by the complainant; that the importation and sale of such articles during the life of said patent No. 1,424,738 constitutes an unfair method of competition and unfair act tending to injure or destroy an industry efficiently and economically operated; that the appellants have not practiced any unfair method of competition or committed any unfair act in said importation, except in the violation of said patent right and in failing to mark said goods in such manner as to avoid confusion between the imported and domestic articles; that the fact that such imported goods are imported and sold at less than the United States prices of the domestic product does not, in itself, constitute unfair competition or an unfair act, within the statute.

As a preliminary to an inspection of the record testimony, for the purpose of ascertaining whether these findings are supported thereby, two legal questions present themselves: First, what degree of evidence is required to support said findings; second, did the Tariff Commission have power and authority to pass upon the validity of the patent rights involved, or shall the validity of such patent right be presumed?

■ As regards the first question, we are of opinion that if there be in the record any substantial evidence in support of the various findings of the Commission, then such findings should stand. This has been the rule uniformly applied by this court in appeals from the United States Customs Court, in matters concerning the appraisement of imported goods, when this court is authorized to examine the record, on appeal, upon a question or questions of law only under section 501, Tariff Act of 1922, 42 Stat. 858, 966 (19 USCA § 381). United States v. Victor & Achelis, 16 Ct. Cust. App. 122, T. D. 42767; Happel & McAvoy v. United States, 16 Ct. Cust. App. 161, T. D. 42791; United States v. Richard & Co., 15 Ct. Cust. App. 143, T. D. 42216; Metz & Co. v. United States, 13 Ct. Cust. App. 412, T. D. 41340.

The same rule has been applied to the review of the decisions and orders of the Federal Trade Commission by the Circuit Courts of Appeal under the provisions of an act entitled "An Act To create a Federal Trade Commission, to define its powers and duties, and for other purposes," approved September 26, 1914, 38 Stat. 717 (15 USCA § 41 et seq.). The rule was stated in C. of C. of Minneapolis v. Fed. Tr. Com. (C. C. A.) 280 F. 45, 48, as follows: "In all cases where Congress had lodged in administrative officers or boards power to find facts and make orders, such findings and orders are conclusive when supported by substantial legal evidence."

See, also, Royal Bak. P. Co. v. Fed. Tr. Com. (C. C. A.) 281 F. 744; Fed. Tr. Com. v. Curtis Pub. Co., 260 U. S. 568, 43 S. Ct. 210, 67 L. Ed. 408; New Jersey Asbestos Co. v. Fed. Tr. Com. (C. C. A.) 264 F. 509; Lehigh Valley R. Co. v. Public Service Com. (D. C.) 272 F. 758; Moir v. Fed. Tr. Com. (C. C. A.) 12 F. (2d) 22.

■ The second question is concerned with the right or duty of the Tariff Commission to pass upon the validity of the patents involved herein. Counsel for both the complainant and respondents proceeded upon the theory, in this court, that the Commission had a right to pass upon the same and much testimony was taken before the Commission on that question. But, whatever the concessions of coun-

sel may be, we are clearly of opinion that it was neither the right nor the duty of the Tariff Commission to pass upon the question as to whether complainants' patents were properly issued or not.

The United States Tariff Commission is, as we have noted, merely an administrative, fact-finding, body. It has no judicial powers. The right to pass upon the validity of a patent which has been issued by the Patent Office is a right possessed only by the courts of the United States given jurisdiction thereof by law. This original jurisdiction, formerly exercised by the Circuit Courts of the United States, is now enjoyed by the District Courts of the United States and the Supreme Court of the District of Columbia. Act of March 3, 1911, c. 231, § 24, 256, 36 Stat. 1091, 1160 (28 USCA §§ 41, 371; section 4921, Rev. St. (35 USCA § 70); Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139; McCormick Machine Co. v. Aultman, 169 U. S. 606, 18 S. Ct. 443, 42 L. Ed. 875. Even where jurisdiction is vested in the Court of Appeals of the District of Columbia, and now in this court, to review the proceedings of the Patent Office in the issuance of patents, it was and is expressly provided by law: "But no opinion or decision of the court in any such case shall preclude any person interested from the right to contest the validity of such patent in any court wherein the same may be called in question." Section 4914, Rev. St. (35 USCA § 62).

Nowhere in the act creating the United States Tariff Commission is there the slightest intimation that it was the purpose to confer jurisdiction upon it to pass upon the validity of patents, matters which are well understood to be cases and controversies within the meaning of section 2 of article 3 of the Constitution. The statute provides, section 316 (c), Tariff Act of 1922 (19 USCA § 176), that the findings of the Commission, "if supported by evidence, shall be conclusive." It would hardly be contended that a finding by the Commission that a certain patent was or was not valid would be considered as res adjudicata. It may well be doubted whether the Congress could confer any such jurisdiction upon this administrative Commission—certainly, it has not done so. The statement of Mr. Justice Curtis in Murray's Lessee v. Hoboken, etc., 18 How. 272, 284, 15 L. Ed. 372, is pertinent: "To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or in admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination."

In short, when the complainant introduced its certified patents in evidence, they should have been treated as prima facie evidence of their validity. Lehnbeuter v. Holthaus, 105 U. S. 94, 96, 26 L. Ed. 939; Fenton Co. v. Office Spec. Co., 12 App. D. C. 201, 216; Consol. Con. Co. v. Hassam Pav. Co. (C. C. A.) 227 F. 436; R. R. Supply Co. v. Hart Steel Co. (C. C. A.) 222 F. 261, 274. If no such patents had been in fact issued, or if they had by their terms expired, or if some court of competent jurisdiction, whose judgment would be binding upon the Commission, had held them to be invalid, and such facts had been shown, these circumstances might have been considered by the Commission, if the existence of the patents was material to the inquiry. This, however, in our judgment, was as far as the Commission could legally go in this respect. As no denial was made by respondents as to the issuance of the patents in question and no attack made upon them except that they were improvidently issued, they should have been treated as·valid by the Commission.

We have examined the voluminous record with care and are satisfied that there is substantial evidence in support of each finding of the Commission. This evidence disclosed that the industry conducted by the complainant, Bakelite Corporation, was efficiently and economically operated; that the importers, appellants, were importing materials and goods and selling them to retailers in the United States which were identical with the goods of complainant and made by the processes described in complainant's patent 1,424,738; that these goods were not marked, except as to their country of origin; that these goods were being sold, by said dealers, generally throughout the United States, as "Bakelite"; that they are called and billed as such; that they are sold at much less than the cost of complainant's product; that such practices have greatly reduced the sales of the complainant's "Bakelite" and have the tendency and effect of destroying and substantially injuring the said industry; that the complainant uses the name "Bakelite" as its trade-mark and has duly registered the same, which registration is in full force and effect; that the complainant Bakelite Corporation has spent large sums of money in· advertising its product and its trade-name of "Bakelite" until, as a result thereof, the name "Bakelite" fully identifies such prod-

ucts as the manufactures of said complainant; that the said practices of dealers is destroying the usefulness of such trade-name and taking from the said complainant the legitimate profits which it is entitled to make because of its said expenditures; that no adequate remedy exists by suits in law or equity; and that the only method which will save the industry from destruction is an embargo.

The sole remaining question for decision is whether such facts are sufficient, in law, to constitute "unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either," as provided in said section 316 (a), 19 USCA § 174.

H. R. 7456, which afterwards became the Tariff Act of 1922, did not, as it passed the House of Representatives, contain the present section 316. This section was inserted by the Senate Committee on Finance and, as originally reported to the Senate, provided that the President might designate any executive department or independent establishment of the government, or both, to investigate any alleged violation and report their findings in the same to him. As the bill passed the Senate, the United States Tariff Commission was substituted as a fact finding agency "on complaint under oath or upon the initiative of such department or independent establishment." In conference, this section assumed the form in which it appears in the law. In reporting the bill to the Senate, the report of the Finance Committee states: "The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country has ever had."

In view of this statement, and having in mind that one of the express objects of the Tariff Act of 1922, as stated in its title, was "to encourage the industries of the United States," it is very obvious that it was the purpose of the law to give to industries of the United States, not only the benefit of the favorable laws and conditions to be found in this country, but also to protect such industries from being unfairly deprived of the advantage of the same and permit them to grow and develop.

What constitutes unfair methods of competition or unfair acts is ultimately a question of law for the court and not for the Commission. Fed. Tr. Com. v. Gratz, 253 U. S. 421, 427, 40 S. Ct. 572, 64 L. Ed. 993; Standard Oil Co. v. Fed. Tr. Com. (C. C. A.) 273 F. 478, 17 A. L. R. 389; Am. Tobacco Co. v. Fed. Tr. Com. (C. C. A.) 9 F.(2d) 570; Fed. Tr. Com. v. Curtis Co., 260 U. S. 568, 580, 43 S. Ct. 210, 67 L. Ed. 408. Each case of unfair competition must be determined upon its own facts, owing to the multifarious means by which it is sought to effectuate such schemes. Fed. Tr. Com. v. Beech-Nut Co., 257 U. S. 441, 453, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882.

The appellants were importing material which constituted an infringement of the patent rights of the complainant Bakelite Corporation. The fact that the respondents purchased the same in a foreign country where their manufacture was in accordance with law, and that they may have lawfully imported the same into this country, does not alter the case. It has been held that where a person was authorized, under the laws of Germany, to sell a certain product there, purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent. The sale of articles in the United States, under a United States patent, cannot be controlled by foreign laws. Boesch v. Graff, 133 U. S. 697, 10 S. Ct. 378, 33 L. Ed. 787.

The same is true as to the registered trademarks of Bakelite Corporation. The monopoly in case of a United States patent is more extensive, but there is no sufficient reason for holding that the monopoly of a trade mark is less complete. Where imported goods were marked with a French trademark, it was held that they could not be sold in the United States when such mark was the same as the trade-mark of the plaintiff in the United States. Ownership of goods does not carry the right to sell them with a specific mark. Bourjois & Co. v. Katzel, 260 U. S. 689, 43 S. Ct. 244, 67 L. Ed. 464, 26 A. L. R. 567.

The Tariff Commission has very ably and succinctly described the conditions confronting the complainants in this proceeding in the following language: "The situation presented by the manufacture in the United States of articles infringing patents is quite different from that presented by the importation of such articles made abroad. In the case of the sale of articles manufactured in the United States the infringing manufacturer

can be proceeded against and thus the unfair practice be reached at its source. Domestic patentees have no effective means through the courts of preventing the sale of imported merchandise in violation of their patent rights. Customs officers are forbidden to disclose information concerning importations. Customs Regulations 1923, Articles 1131, 1323. When such merchandise is delivered from customs custody it may be and frequently is distributed throughout the United States. The difficulties which confront a patentee seeking to enforce his rights through the courts are practically insurmountable. He is required to proceed against each individual dealer selling the infringing articles, which of course would lead to a multiplicity of suits with little likelihood that all infringing dealers could be reached. The cost of the numerous suits with the small amount of damages which may be recovered in any one suit discourages resort to the courts. Moreover, a decree obtained against one dealer would have no binding effect upon others, and by the simple expedient of changing the consignees the effect of a decree when secured would be nullified. Unless, therefore, section 316 may be invoked to reach the foreign articles at the time and place of importation by forbidding entry into the United States of those articles which upon the facts in a particular case are found to violate rights of domestic manufacturers, such domestic manufacturers have no adequate remedy."

The essence of unfair methods of competition consists in the palming off of the merchandise of one person for that of another. Samson Cordage Works v. Puritan Cordage Mills (C. C. A.) 211 F. 603, L. R. A. 1915F, 1107; Standard Paint Co. v. Trinidad Asphalt Co., 220 U. S. 446, 461, 31 S. Ct. 456, 55 L. Ed. 536; Charles Broadway Rouss v. Winchester Co. (C. C. A.) 300 F. 706. It cannot be doubted, on inspection of this record, that the goods which the respondents were importing were continuously being sold to purchasers as the goods of Bakelite Corporation, in violation of not only its patent rights but its right to the exclusive use of its trade-name. This constituted unfair methods of competition and deprived this complainant of the privileges and rights which the laws of this country gave it.

It is, however, contended that the respondents were not personally guilty of any unfair acts or methods of competition; that they cannot be held responsible for what others may have done with the goods they imported and sold to them. A deliberate effort to de-

ceive is not a necessary element in unfair competition. The question is whether there is actual confusion. Fed. Tr. Com. v. Balme (C. C. A.) 23 F.(2d) 615. It has been held that where a defendant in an infringement suit knew of the existence of the patent and that another person was infringing the same, and sells to such other person supplies without which the infringer could not operate the same, with the intent and purpose that such infringed article should be used by means of said supplies, such defendant assists in the infringing use and is contributory thereto. A presumption arises that there is such intent when the article so sold is only adapted to an infringing use. Henry v. Dick Co., 224 U. S. 1, 33–48, 32 S. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880.

A case in point is Warner & Co. v. Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 617, 68 L. Ed. 1161. In that case goods were made and sold to dealers without any misrepresentation of the character or origin of the product. The testimony discloses, however, many instances of passing off by retail druggists of the petitioner's preparation when respondent's preparation was called for. The Supreme Court held: "That no deception was practiced on the retail dealers, and that they knew exactly what they were getting, is of no consequence. The wrong was in designedly enabling the dealers to palm off the preparation as that of the respondent. * * * One who induces another to commit a fraud and furnishes the means of consummating it is equally guilty and liable for the injury."

"That a person is a wrongdoer who so furnishes another with the means of consummating a fraud has long been a part of the law of unfair competition." Fed. Tr. Com. v. Winstead Co., 258 U. S. 483, 494, 42 S. Ct. 384, 386, 66 L. Ed. 729. Even if dealers understand they are buying a counterfeit and not a genuine product, the manufacturer of the counterfeit will be enjoined from selling it to such dealers with the purpose and expectation that it shall be used by the dealers to deceive the consumer. Coca Cola Co. v. Gay-Ola Co. (C. C. A.) 200 F. 720.

The appellants were engaged in the importation and sale of synthetic phenolic resin in violation of complainant's patent rights. It must have been obvious to them that such goods were being sold as "Bakelite," and that purchasers were being misled as to the origin of the goods. In such case a burden rested upon these importers to see to it that purchasers should not be deceived by confusion

in the goods, and to so mark their goods that such confusion should not result. Samson Cordage Works v. Puritan Cordage Mills, supra; Elgin Nat'l Watch Co. v. Ill. Watch Co., 179 U. S. 665, 674, 21 S. Ct. 270, 45 L. Ed. 365; Auto Acetylene Light Co. v. Prest-O-Lite Co. (C. C. A.) 264 F. 810; Rathbone, Sard & Co. v. Champion Steel Range Co. (C. C. A.) 189 F. 26, 37 L. R. A. (N. S.) 258; Bayer Co. v. United Drug Co. (D. C.) 272 F. 505, 515; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 S. Ct. 1002, 41 L. Ed. 118.

▮ Error is assigned upon the rulings of the Commission in admitting certain evidence, which was claimed to be hearsay, and in failing to order the books of Bakelite Corporation to be exhibited to respondents for examination. There was no error in these respects. The books in question were always open to the inspection of the Commission for any purpose and this is sufficient. Full and free cross-examination was permitted as to all details of the efficiency and economy of the operation of this complainants' business. The law does not require or intend that one who complains under the statute must disclose all his trade secrets to the respondent.

We find no error of law in the findings of the United States Tariff Commission herein, and they are therefore affirmed.

Affirmed.

LENROOT, Associate Judge, did not participate.

GARRETT, Associate Judge (dissenting).

This court has heretofore held that the instant proceedings constitute a case or controversy in a judicial sense under section 2 of article 3 of the Constitution of the United States. In re Frischer & Co., Inc., et al., 16 Ct. Cust. App. 191. In that same decision it was held that this court was an inferior constitutional court. When these questions were carried before the Supreme Court of the United States, that tribunal did not decide the former issue but reversed this court upon the latter. Ex parte Bakelite Corporation, 279 U. S. 438, 49 S. Ct. 411, 73 L. Ed. 789. It was held to be immaterial whether it constituted a case or controversy or not so far as this court's authority to review it as the statute provides is concerned.

Under this holding of the Supreme Court, I should not regard it necessary for this court to pass upon the constitutionality of section 316 of the Tariff Act of 1922 (19 USCA §§ 174–180), were it not for that part of the former decision of this court holding it to be a case, or controversy, in a judicial sense. Inasmuch as the Supreme Court did not pass upon this question, I take it that that portion of the decision of this court must, for the purposes of this hearing, be treated as res adjudicata, and, so accepting it, whatever my opinion might have been had I then been a member of the court, I acquiesce in the necessity of our passing upon the constitutional question now for the first time presented to us under circumstances requiring decision. It was not involved in the review of the matter by the Supreme Court referred to.

I am unable to agree with the majority in their conclusion and deem it proper respectfully to state my own views.

The majority hold section 316 to be constitutional, basing their holding almost wholly upon the decisions of this court and the Supreme Court of the United States in the case of J. W. Hampton, Jr., & Co. v. United States, 14 Ct. Cust. App. 350; Id., 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624. In that case the constitutionality of section 315 (19 USCA §§ 154–159), commonly known as the "flexible tariff provision" of the Tariff Act of 1922, was sustained.

In my opinion there are certain differences, fundamental in their nature, which distinguish the two sections.

By section 315 the President of the United States is charged with certain administrative duties in the performance of which it is provided that he shall have the assistance of the Tariff Commission in making investigations and finding facts. Both the President and the Commission are limited strictly to *fact* finding. No questions of law are submitted to them for determination; no opinion or theory is to be applied. Upon an ascertainment of "differences in costs of production of articles * * * wholly or in part the growth or product of the United States and of like or similar articles wholly or in part the growth or product of competing * * * countries," the President is authorized to put into effect certain tariff duties specifically provided in the law. These differences in cost of production are held by the court to be capable of ascertainment, theoretically if not actually; Congress, anticipating that such facts could and would be ascertained, provided a definite law to be applied under them, and the courts held this

not to be a delegation of legislative authority in contravention of the constitutional limitation.

It may be here noted that section 315 expressly provides that no proclamation shall be issued under it by the President until there has been an investigation by the Tariff Commission. The Tariff Commission is made an indispensable, part of the administrative machinery for enforcing that section. No such provision is made for the administration of section 316. While this fact standing alone, perhaps, has no bearing upon the question of constitutionality, it becomes of importance for an understanding of the real nature of the two sections. It will be further noted that section 315 does not require or even authorize recommendations by the Commission; section 316, apparently, authorizes such recommendations, if it does not make them mandatory. Again, no court action is provided as a part of section 315. In section 316 express provision is made for action by the Court of Customs Appeals and the Supreme Court of the United States, but only in such cases as may be acted upon by the Tariff Commission.

For the moment, however, the point which it is desired to emphasize is that in section 315 Congress made the law and authorized the executive branch of the government simply to ascertain facts under which the law should be applied, and that it was for this reason that the courts, following numerous authorities, found themselves able to sustain it; it being the duty of the courts always to give to acts of the legislative branch every presumption of constitutionality.

When section 316, which the Supreme Court in the Bakelite Case, supra, said "is not happily drawn," is carefully analyzed, it must be apparent, it seems to me, that Congress has therein gone much further in delegating lawmaking authority than it sought to go or went in section 315.

In section 316 (19 USCA §§ 174–180) there seems to me to be committed to the President of the United States the authority and duty of making findings not only of fact but of law. Paragraph (a) of the act (19 USCA § 174) reads: "That unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are hereby declared unlawful, and when found by the President to exist shall be dealt with, in addition to any other provisions of law, as hereinafter provided."

In paragraph (e) (19 USCA § 178) which provides the remedy the President is required when the "unfair method or act," denounced in paragraph (a) without being defined, "shall be established" to his satisfaction, to determine and direct the levying of certain additional duties, or "in what he shall be satisfied *and find* are *extreme* cases of unfair methods or acts as aforesaid" to direct an embargo excluding the offending merchandise from entry into the United States. (Italics mine.)

Paragraphs (b), (c), and (d) of section 316 (19 USCA §§ 175, 176, 177) make possible but not mandatory the bringing of the Tariff Commission and the Court of Customs Appeals and the Supreme Court of the United States into the equation; the Tariff Commission "to assist the President in making any decisions" by investigating "any alleged violation hereof on complaint under oath or upon its initiative," and the courts to review the findings and recommendations of the Commission upon "a question or questions of *law only*." (Italics mine.)

If these paragraphs, (b), (c), and (d), were entirely eliminated from section 316, there would still remain in the other paragraphs a complete act or law. The President is not required to wait upon or have an investigation by the Tariff Commission, as is the case in administering section 315 (19 USCA §§ 154–159), before issuing directions relative to additional duties or embargo. He may obtain the information which satisfies his mind as to what is unfair competition according to his idea of what that phrase means, and ascertain what the facts are, from any source or sources whatsoever that he chooses to consult or regard.

When the assistance of the Tariff Commission is invoked or availed of, however, that body must find facts and, in my opinion, also must determine questions of law. These are embodied in its report. This court can then be invoked to review the questions of law only and an appeal can then be had to the Supreme Court upon certiorari, confined, of course, as this court is confined, to the questions of law.

Manifestly by providing the court action Congress evidenced its intent to delegate to the Commission the authority to make

findings of law; otherwise, it did a vain thing in providing a court review upon law questions *only*.

What the Commission does is certainly a part of what the President is charged with the responsibility of finally doing. He may do it with or without the Commission's aid. If he does it without, there is no court review provided. His findings of both law and fact are final. If the aid of the Commission is invoked, as has been done in the instant case, thereby making possible a limited court review, the President may disregard both the findings of the Commission and courts, make his own findings as to law and fact, and direct the levy of additional duties, or he may declare an embargo, if he finds the case "extreme."

This is one of the features incident so this statute which creates difficulty for any court proceeding under it in a case such as that at bar. Our decision has not the force and effect of law; a conclusion expressed in terms of affirmation or reversal, using the nomenclature customary in court procedure, means nothing, so far as binding individuals in any legal sense is concerned and, apparently, if the Supreme Court shall take the jurisdiction provided for it by the statute, in this or some similar case, and pronounce a judgment upon the merits as this court is doing, it will have no greater binding effect as a judgment at law than our own. By its own force such judgment can exercise no control over the actions of the executive under the section.

In section 315, it seems well to repeat, and in various laws which were cited in the court decisions sustaining its constitutionality, Congress did the legislating; Congress declared what the law was, or should be, under a specific state of facts capable of being ascertained purely as facts. The elements that were to enter into the cost of production were expressed; nothing, it was held, was left to theory or opinion as to what constituted the law. The legislative outposts were set; the legislative intent and limitations were held to be clearly defined.

I cannot agree that this situation exists as to section 316, and that therefore this case is controlled by the Hampton decision, or the decisions therein cited as authorities.

Let paragraphs (a) and (e) of section 316 (19 USCA §§ 174, 178) be looked to. The portions pertinent to this discussion have been quoted supra.

What do the words "unfair methods of competition and unfair acts in the importation of articles into the United States" mean? What elements of conduct must be present in an act of importation in order to render it unfair? The same questions may be asked as to the meaning of the words, "or in their sale," what acts in connection with the sale of an imported article must be shown to make the sale classifiable as unfair?

Congress has not said. Some one, the President finally, must say. Are these questions of fact only, similar to finding the difference in dollars and cents in production costs, or are they matters of opinion—opinion which when declared by competent constitutional authority becomes law?

In the case of Federal Trade Commission v. Gratz, section 5 of the Federal Trade Commission Act of September 26, 1914 (15 USCA § 45), was involved. 253 U. S. 421, 40 S. Ct. 572, 575, 64 L. Ed. 993. In discussing it the Supreme Court said: "The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as matter of law what they include."

In the instant case the words "unfair methods of competition" and "unfair acts in the importation of articles into the United States" are not defined with any more specificness than were the quoted words in the Federal Trade Commission Act, but, unlike the latter law, section 316 (19 USCA §§ 174–180) leaves it to the executive to define them. True in such cases as happen to be investigated by and reported upon by the Tariff Commission this court is clothed with authority to review the questions of law, and the Supreme Court also may do this upon writ of certiorari, but the findings of both courts may be disregarded, so far as any legal force inherent in them is concerned, and in cases not acted upon by the Tariff Commission there is no provision for review by any court.

The Federal Trade Commission Act has been held constitutional in decisions by the United States Circuit Court of Appeals of both the Seventh and Sixth Circuits. Sears, Roebuck & Co. v. Federal Trade Commission (C. C. A.) 258 F. 307, 311, 6 A. L. R. 358; National Harness Mfrs. Ass'n v. Federal Trade Commission (C. C. A.) 268 F. 705, 707. But this was true because the courts held that neither judicial nor legislative authority had been delegated to that body. In the former case it was pointed out that "the restraining order of the commissioners is merely provisional. The trader is entitled to his day in court. * * *"

A syllabus of the second case reads: "The authority given the Federal Trade Commission to determine what methods of competition a given trader employs, and, provisionally, to determine whether such methods are unfair, subject to right of review by the courts, does not confer on the commission judicial powers, or invalid executive or administrative authority, contrary to Const. arts. 1, 2, 3, in view of the fact that the commission's determination is not only subject to review, but *is enforceable only by the courts.*" (Italics mine.)

The court said: "The commission's determination of these questions is not final. Not only does the statute give a right of review thereon, upon application by an aggrieved trader, to a Circuit Court of Appeals of the United States, but the commission's order is not enforceable by the commission, but only by order of court."

The difference in the Federal Trade Commission Act and section 316 of the Tariff Act of 1922 (19 USCA §§ 174–180), in so far as authority for determining and applying the law is concerned, becomes immediately manifest. In the former it is determined and enforced by the judiciary; in the latter, by the executive.

But attention is directed to that language of the section which reads: " * * * The effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States." And it is argued that these are words of definition. I cannot think so. Surely they are words of limitation. Congress did not seek to denounce all acts that might be considered unfair, but only those that might have the effect or tendency or the result indicated. Otherwise, the word "unfair" would not have been so carefully inserted before the words "methods" and "acts." I do not think the clause last quoted is intended to define what constitutes unfair acts, but is to limit those which the section denounces as unlawful. Had Congress omitted the word "unfair," then the subsequent clauses might constitute definition. But even if we accept them as words of description or definition, there still remain questions inherent in the phrases which it seems to me must be determined as matters of law and not as facts only. Destruction of a business can be regarded as a thing of fact, but "tendency to destroy" requires something more. "Substantially injure" opens the door to opinion, belief, and speculation. Concerning the question of whether an industry is "efficiently and economically operated," there may exist many different opinions according to the standard in the mind of the person considering it. It is conceivable that there may be importations whose sale might have an effect or tendency "to restrain or monopolize trade or commerce in the United States," although there is a theory subscribed to by many that the converse is most frequently true, but certainly restraint and monopolization of trade and commerce present some quite weighty questions of law. Congress, to be sure, has defined these latter terms in other acts, but heretofore these acts have been regarded as presenting questions of law to be determined by the judicial branch of the government and not by the executive. Even if these be accepted as defined, the other phrases remain without any statutory definition.

After finding the meaning of the different phrases contained in the words of limitation, they must then be applied by whatever President happens to be administering the section, as he determines what constitutes "unfair methods of competition or sale," and no factors are established in the law by which to measure or test an act.

There are some reported decisions of the Supreme Court of the United States which seem to me to present authority decidedly more applicable in the case at bar than is the reasoning in the Hampton Case. Reference is had particularly to United States v. L. Cohen Grocery Co., 255 U. S. 81, 41 S. Ct. 298, 300, 65 L. Ed. 516, 14 A. L. R. 1045; Weeds, Inc. v. United States, 255 U. S. 109, 41 S. Ct. 306, 65 L. Ed. 537; and Small Co. v. Am. Sugar Refining Co., 267 U. S. 233, 45 S. Ct. 295, 297, 69 L. Ed. 589.

In those cases certain language of the Food Control Act of August 10, 1917 (40 Stat. 276), as amended October 22, 1919 (41 Stat. 297), commonly known as the Lever Act, was involved. Section 4 of that act, passed as a war time measure, contained the language: "That it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries; to conspire, combine, agree, or arrange with any other person * * * (e) to exact excessive prices for any necessaries. * * * Any person violating any of the provisions of this section upon conviction thereof shall be fined not exceeding $5,000

or be imprisoned for not more than two years, or both. * * * "

Cohen & Co. and Weeds, Inc., were indicted, charged with having violated this section. In the Cohen Case the indictment was quashed by the United States District Court on the ground that the language of the act was repugnant to the Constitution, and the government appealed to the Supreme Court, which affirmed the District Court. In the Weeds Case the indictment also involved the conspiracy phrase in addition to the other part of the section. The District Court overruled defendant's demurrer in that case, and by certiorari it was carried to the Supreme Court, which reversed it upon the same ground as that upon which the Cohen Case was affirmed. Several other cases involving the same question were similarly disposed of.

In the Cohen Case the Supreme Court, speaking through Chief Justice White, said:

"The sole remaining inquiry, therefore, is the certainty or uncertainty of the text in question, that is, whether the words 'that it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries,' constituted a fixing by Congress of an ascertainable standard of guilt and are adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them. That they are not, we are of opinion, so clearly results from their mere statement as to render elaboration on the subject wholly unnecessary. Observe that the section forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. In fact, we see no reason to doubt the soundness of the observation of the court below in its opinion to the effect that, to attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury. And that this is not a mere abstraction, finds abundant demonstration in the cases now before us, since in the briefs in these cases the conflicting results which have arisen from the painstaking attempts of enlightened judges in seeking to carry out the statute in cases brought before them are vividly portrayed. * * *

"That it results from the consideration which we have stated that the section before us was void for repugnancy to the Constitution is not open to question. United States v. Reese, 92 U. S. 214, 219-220, 23 L. Ed. 563; United States v. Brewer, 139 U. S. 278, 288, 11 S. Ct. 538, 35 L. Ed. 190; Todd v. United States, 158 U. S. 278, 282, 15 S. Ct. 889, 39 L. Ed. 982. And see United States v. Sharp, 27 Fed. Cas. 1041, 1043 [Fed. Cas. No. 16264]; Chicago & Northwestern Ry. Co. v. Dey (C. C.) 35 F. 866, 876, 1 L. R. A. 744; Tozer v. United States (C. C.) 52 F. 917, 919, 920; United States v. Capital Traction Co., 34 App. D. C. 592, 19 Ann. Cas. 68; United States v. Pennsylvania R. R. Co., 242 U. S. 208, 237-238, 37 S. Ct. 95, 61 L. Ed. 251."

It is true that these were criminal prosecutions, but the subsequent Small Co. Case was a civil action between individuals, involving solely the question of liability on a civil contract, and the court again held the statute unconstitutional, saying: "The defendant attempts to distinguish those cases because they were criminal prosecutions. But that is not an adequate distinction. The ground or principle of the decisions was not such as to be applicable only to criminal prosecutions. It was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all. Any other means of exaction, such as declaring the transaction unlawful or stripping a participant of his rights under it, was equally within the principle of those cases. They have been so construed and applied by other courts in civil proceedings. Standard Chemicals, etc., Corporation v. Waugh Chemical Corporation, 231 N. Y. 51, 54, 131 N. E. 566, 14 A. L. R. 1054; Dunman v. South Texas Lumber Co. (Tex. Civ. App.) 252 S. W. 274, 275. In the first of these citations, the Court of Appeals of New York, referring to this court's ruling in the Cohen Grocery Co. Case, well said: 'The ground on which it placed its judgment applies, and with like consequences, to civil suits as well. The prohibition was declared a nullity because too vague to be intelligible. No standard of duty had been established. * * * The variant views of judges of the District Courts were quoted as evidence of the absence of a standard. If this is the rationale of the decision, its conse-

quences are not limited to criminal prosecutions. A prohibition so indefinite as to be unintelligible is not a prohibition by which conduct can be governed. It is not a rule at all; it is merely exhortation and entreaty.'"

Passing from paragraph (a) to paragraph (e) of section 316 (19 USCA §§ 174, 178), it is to be observed that an embargo may be declared by the President only "in what he shall be satisfied and *find* are extreme cases of unfair methods or acts as aforesaid." (Italics mine.)

There is no standard fixed by Congress by which to measure even methods so as to determine that they are unfair, but the statute adds degree to unfairness and leaves it to the executive to say not only what constitutes unfairness but what the degree of that unfairness is. Surely in the absence of any standard of law variableness of opinion as to what is extreme is inevitable, and opinion is not law except as it be declared by constitutional authority; the Legislature in making it, the judiciary in construing it.

It seems to me that whichever way one turns in the effort to give vitality to the section he finds himself upon an open sea of individual opinion with no statutory chart or legislative compass, no congressional lighthouse, or beacon or buoy.

If the statute be enforced there must be a determination that something is the law which Congress has not written therein. It seems to me to be a delegation of lawmaking power (for in this instance the law-finding will be the lawmaking), and so, in its essential and fundamental elements, I regard it as being repugnant to those parts of the Constitution which limit legislative authority to the Congress and judicial authority to the courts.

The anomalous, uncertain, and indefinite character of section 316 is conspicuously illustrated by what appears to be the predominant issue (aside from the constitutional question) involved in the instant case.

That issue is found in the inquiry as to whether in enacting section 316 (19 USCA §§ 174–180) it was the intent of Congress to bring alleged patent infringements wrought by the importation of foreign merchandise to compete with similar merchandise produced in the United States as patented articles, within the purview of the "unfair methods of competition and unfair acts in the importation of articles" declared unlawful.

Without attempting to review the testimony in full, I feel that it justifies the conclusion that if the question of alleged patent infringement were eliminated from this case the proceedings would be virtually at an end.

This would certainly be true if the alleged trade-mark complications or infringements were also eliminated, and as to these latter it would appear that the proper procedure would be to invoke section 526 of the Tariff Act of 1922 (19 USCA §§ 141–143) rather than section 316 (19 USCA §§ 174–180). That situation could at least be fully dealt with without recourse to section 316.

The majority opinion recites that: "Findings [of the Tariff Commission] one, two, three, four, five, six, nineteen, twenty, twenty-one, twenty-two and twenty-three are, plainly, findings that the respondents have been guilty of unfair practices and are not at all based upon the validity or invalidity of the patents in question."

I cannot agree that this is an entirely accurate construction of certain of these findings. Nos. 2 and 3 in particular specifically refer to patents owned by the Bakelite Corporation, and this ownership I understand to be the essential feature of these findings. Others of the enumerated findings do not deal with unfair practice at all, but, disregarding this, finding No. 24, which appears to be in the nature of a general summing up or conclusion, reads as follows: "That articles made of synthetic phenolic resin, form C, have *not* been imported into the United States or sold therein by any respondent owner, importer, consignee, or agent of either, marked "bakelite"; and that *apart from the question of violation of patent rights* no such owner, importer, consignee, or agent of either has practiced any unfair method of competition or committed any unfair act in the importation of articles made of synthetic phenolic resin, form C, other than the failure to clearly and unmistakably distinguish such imported articles from articles made of synthetic phenolic resin, form C, manufactured by the Bakelite Corporation, as to reasonably avoid confusion between the imported and the domestic articles on the part of the purchasing public. (Italics mine.)"

The effect of the majority decision is to hold that section 316 contemplates treating alleged patent infringement as constituting at least one method of the "unfair competition" or one of the "unfair acts" therein denounced. At the same time they hold that in cases where the aid of the Tariff Commission

is invoked in the administration of the section, that body is wholly without authority to pass upon the validity of the patents involved; that this authority is vested solely in the courts; and that the Commission can go no further than determine (a) that patents issued, (b) that they had not expired, and (c) that they had not been held invalid by "some court of competent jurisdiction, whose judgment would be binding upon the Commission," and the effect is to hold that mere prima facie evidence becomes conclusive for the purpose of the section.

I assume that the logic of this holding necessarily leads to the conclusion that the President, in executing the section, is likewise without power or authority to determine patent validity. This assuredly must be true, for to hold otherwise would at once, it seems to me, bring the section (as I think it is brought by other matters already recited) indisputably beneath the constitutional ban, since it would be a declared attempt to clothe the Executive with the power to make law.

I do not disagree with the conclusion as to lack of authority in any tribunal other than specifically authorized courts to determine patent validity, but when this doctrine is applied under section 316, we are at once brought to the anomalous and strange situation whereunder additional duties may be levied, or an embargo declared, based upon a claim of patent which, upon complete examination by competent authority, may be found to be null and void, and to have been so from the very beginning.

I am unable to find where, in section 316, or in any other act which Congress has ever passed, it evidenced any purpose to do such a thing as that, and, for that reason, I cannot agree with the majority that Congress in enacting the section had it in mind that alleged patent infringements should be dealt with under it. I feel that had it intended to do this, provision, in some way, would have been made for assuring a definite and legal finding upon any question of patent validity raised.

The essential purpose of our patent system is to benefit the public by encouraging the genius and wit of men to develop new and useful things for mankind's benefit and enjoyment, and this is proposed to be accomplished by giving to inventors who secure patents a species of monopoly for a limited period, but Congress has never evinced a purpose to give favor or protection except to those who hold *valid* patents.

From the standpoint of general public policy, therefore, and keeping in mind the spirit of our institutions, one can appreciate the feeling of the majority of the Tariff Commission when, having determined that they had jurisdiction under section 316 to make investigations of unfair methods or acts arising from rights granted under the patent laws, they felt themselves entitled to go further and consider and determine the validity of a patent. They said: "Manifestly there can be no infringement of an invalid patent. It follows that the validity of a patent may be an essential element of the investigation."

The error, if error there be, on the part of the majority of the Tariff Commission, does not lie in the abstract principle of law asserted by them, but in the general assumption that Congress intended by section 316 to commit legislative or judicial authority to the President, and, through the President, to them when brought to his aid in administering it.

It seems to me that the fact that Congress in the Tariff Act of 1922 enacted section 526 (19 USCA §§ 141–143) making it unlawful to import merchandise which might infringe trade-marks of citizens of the United States, and did not in section 316 (19 USCA §§ 174–180), or elsewhere, specifically, or in general terms, make any provision touching the importation of merchandise which might infringe patents held by citizens of the United States, argues most strongly that it had no purpose of attempting to deal therein with that species of international commerce, and that the whole subject-matter was left to be determined under the general laws of the country. If the word "patent" appears anywhere in the Tariff Act, it has escaped my search.

The attention of this court has not been directed to any case arising at any time in our courts where it has been held that the mere infringement of a patent, unaccompanied by other facts, constitutes unfair competition.

In so far as the instant case depends upon patent infringement, therefore, the majority of this court, if its decision when proceeding under section 316 has any judicial effect, would bring into the legal system of the country as an act of unfair competition, or practice, or method, an element which neither Congress or any court has ever heretofore declared to be such; and that, too, while holding the body from which the appeal comes to us to be without authority to deter-

268

mine the validity of the patents alleged to be infringed, and, I assume, while agreeing that neither this court nor the President of the United States has any such authority.

As I understand it, the patent laws proceed wholly upon the theory that letters patent constitute prima facie evidence only that the patentee is entitled to the patent, and I know of no case, where infringement of a patent was the subject-matter of the proceeding, which holds that the certificate of the Patent Office is conclusive of validity, as the majority opinion holds those here in issue to be for the purposes of this proceeding.

It is true that if it should be held that the statute does require a judicial finding by the President, and those who aid him, upon the question of validity, aside from the prima facie presumption, the effect would undoubtedly be to bring it into immediate conflict with the Constitution, but that is not the fault or responsibility of this court. Congress has ample power to deal with the question by making the law itself whenever it may elect to do so.

Trade-mark infringement, when found by the courts, enters into the law of unfair competition, but patent infringement, standing alone, has been otherwise treated and dealt with by them.

In the innumerable decided cases relating to unfair competition, fraud and deceit must be shown in order to establish it.

"Unfair competition consists essentially in the conduct of a trade or business in such a manner as that there is an express or implied representation that the goods or business of one man are the goods or business of another." Am. & Eng. Ency. Law (2d) 345.

"The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another; and if defendant so conducts its business as not to palm off its goods as those of complainant, the action fails." Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U. S. 118, 140, 25 S. Ct. 609, 614, 49 L. Ed. 972.

In the instant case, I think it cannot be successfully argued that any alleged patent infringement is responsible for any alleged deceit or "palming off" of goods. If any infringement occurred, it did not constitute deceit, but was the violation of a legal right held by the patentee for which the general laws of the country provide a remedy.

I cannot subscribe to the doctrine that simply because it might be difficult for a patentee to obtain what he conceived to be ample redress against the importers of foreign goods

alleged to infringe his patents, it follows that Congress intended to apply to importations, as constituting unfair practices, elements which were not mentioned or hinted at in the statute and which no court has ever heretofore held to be such.

Whether the proceedings here be regarded, as the opinion of the majority of the Tariff Commission declares, as "a general inquiry in the public interest," rather than as a "contest between an individual American manufacturer and an individual importer," does not and cannot alter the fundamental elements which, in a legal sense, must be present to constitute unfair trade practices. Had Congress wished patent infringement to become an element to be specially dealt with under the customs laws, it could have so specifically provided, as it did in trade-mark matters by section 526 (19 USCA §§ 141–143).

From my personal experience in the study of this case I am convinced that much of the confusion which seems to have attended its consideration on all sides has grown out of the, perhaps not unnatural, disposition to treat section 316 (19 USCA §§ 174–180) as being, in its fundamental legal aspects, on all fours with section 315 (19 USCA §§ 154–159), the so-called "flexible" provision, and I have endeavored herein to differentiate the two.

A study of the history of the legislation as disclosed in the Congressional Record indicates that in the Senate, wherein both sections originated, the Senators themselves did not appear to differentiate them. There was practically no analysis of or debate upon section 316. Section 315 was elaborately debated and it was vitally amended on the Senate floor. Language was inserted, offered as amendments, which probably proved the deciding feature which enabled the courts to uphold its constitutionality.[2]

No such language giving definitions and declaring what should constitute the unfair methods denounced as unlawful in section 316 were inserted into it, and so it was left in hazy and indefinite form.

There seems to be a disposition to treat the function of the Tariff Commission under 316 as being analogous to its function under 315. Apparently as a result of this disposition much time was spent in the argument and much space is devoted in the briefs to the

[2] The amendments to the amendment to which I make reference were offered by Senator I. L. Lenroot, who is now an Associate Judge of this court.

question of whether the report of the Tariff Commission really constitutes valid findings, since there were six members of the Commission and the findings were signed by only three of them. The majority opinion of this court deals with this question in an entirely satisfactory manner, so far as I am concerned; but if the same issue could be presented in a proceeding under section 315 a different question might exist, because an investigation by the Tariff Commission is an indispensable prerequisite for action under it.

In a proceeding under section 316 it does not seem to me to be of any vital legal consequence how the findings by the Tariff Commission are signed or by how many of its members, except that probably this court could not review any except a report by a majority. In the ultimate result it would not be legally consequential because the function of the Commission under 316 is purely advisory and is neither affirmatively nor negatively binding upon the Executive or any one else.

The decision of this court is in precisely the same category as the Commission's report, so far as any legal effect is concerned. We function under section 316 only in cases where the Tariff Commission acts and appeals come to us from that body. There is not conferred upon us any authority similar to that conferred upon the Circuit Court of Appeals of the United States in the Federal Trade Commission Act.

It is true that in paragraph (c) of section 316 (19 USCA § 176) the statement is made that the "judgment of said court (of Customs Appeals) shall be final," except it is made subject to possible review by the Supreme Court, but what does that mean? It, at least, does not mean that of itself that judgment as pronounced law must control the Executive's action. If by any possible construction it could be held to mean that, then the Executive, should he desire, has only to proceed to make findings through some other agency than the Tariff Commission, or through no agency whatever, and the matter cannot reach the courts under this particular section.

So far as my knowledge of the legislative history of our country extends, that portion of section 316 which provides for a court review, under certain circumstances, of steps taken looking toward an administrative or executive action, in advance of that action, is without any congressional legislative prototype. The novelty of it alone renders it an interesting study, but the full effect it was intended to accomplish by such procedure is not, I confess, as yet altogether clear to my understanding.

Under the theory announced in the beginning of this dissent, namely, that the instant proceedings constitute a case or controversy, I have sought to deal with it purely from the legal standpoint and in a judicial sense. The majority opinion has done the same.

If this theory be erroneous and it was contemplated that we should deal with it from an economic standpoint and as a board rather than as a court, then I should wish considerably more enlightenment upon several of the involved factors before assuming any responsibility in connection with it.