O’MALLEY, Circuit Judge,
dissenting, with whom PROST, Chief Judge, LOURIE and DYK, Circuit Judges, join.
The majority today authorizes the International Trade Commission (“Commission”) to bar the importation of articles of commerce that may or may not be later used by third parties to infringe a method patent, based only on the putative intent of the importer. And, it does so in circumstances in which it is undisputed that the patented method cannot be practiced unless the imported article is used in combination with software neither embedded in the imported article nor sold by the importer. Because 19 U.S.C. § 1337 unambiguously fails to provide the Commission with the authority the majority endows on it, I respectfully dissent.
The majority justifies its decision on two grounds: (1) policy concerns regarding the desire to protect United States patent holders from unfair competition; and (2) deference to the Executive agency’s view of how best to fulfill its role in regulating “international commerce”. But we are not the appropriate audience for policy concerns except to the extent we are charged with enforcing the policy articulated in the statutory scheme Congress actually adopted. When Congress provides us with clear instructions, we are to follow those instructions regardless of our own policy preferences. Deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is not to be used as a substitute for statutory interpretation. This is especially true when, as here, the interpretation proffered by the agency “makes scant sense.” Mellouli v. Lynch, — U.S. -, 135 S.Ct. 1980, 1989, 192 L.Ed.2d 60 (2015).
Like us, the Executive may not expand the limited powers afforded to it by Congress under the guise of “deference”. At the Executive’s invitation, the majority strains to find an ambiguity in the statute where there is none, just so it may resort to the protective umbrella of Chevron. Although the majority says it is concerned about importers taking advantage of an apparent gap in the statute, any gaps should be filled by Congress, not by us or the Commission. The patent holder here is well protected under the patent laws— having the ability to stop the only entity practicing its patented method from doing so in an action in district court under 35 U.S.C. § 271(a), and the ability to seek *1355 damages from any importer acting with an intent to induce that entity to so act. We should not rewrite the trade laws out of a desire to enhance that remedy.
I. The LANGUAGE OF THE STATUTE
Our analysis of the scope of § 1337 must begin with the language of the statute. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (“As in any case of statutory construction, our analysis begins with the language of the statute.” (internal quotation marks omitted)) The Commission is itself a creature of statute, and its authority to issue an exclusion order must emanate from a statutory grant of power. See Kyocera Wireless Corp. v. Int’l Trade Comm’n, 545 F.3d 1340, 1355 (Fed.Cir. 2008). Under the familiar framework of Chevron, as the majority correctly notes, we only defer to the agency’s construction of the statute if the statute in question is ambiguous. If “Congress has directly spoken to the precise question at issue,” our “inquiry is at an end”; we are to “give effect to the unambiguously expressed intent of Congress'.” Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. Here, Congress— not the panel decision in this case — explicitly chose to exclude liability under § 1337 for induced infringement of a method claim that is not directly infringed, if at all, until after importation. We therefore do not afford the Commission’s construction any deference.
Section 1337(a), in relevant part, states that:
(1) Subject to paragraph (2), the following are unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provision of law, as provided in this section:
(A) Unfair methods of competition and unfair acts in the importation of articles ... into the United States ...
(B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that—
(i) infringe a valid and enforceable United States patent ...
(ii) are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent.
The key language is “articles that — infringe.” Because the majority finds this language to be ambiguous, it concludes that we must defer to the Commission’s interpretation. Maj. Op. at 1346-48. The majority fails, however, to identify an actual ambiguity in the statute. The word “articles” is not ambiguous — it has a well-defined legal definition. See Black’s Law Dictionary 160 (7th ed.1990) (defining “article” as “[generally, a particular item or thing”); see, e.g., also Freeman v. Quicken Loans, Inc., — U.S.-, 132 S.Ct. 2034, 2041-42, 182 L.Ed.2d 955 (2012) (looking to dictionary definitions to define the “normal usage” of a statutory term). The word connotes a physical object. And, Congress itself has defined “infringe” in 35 U.S.C. § 271. See, e.g., 35 U.S.C. § 271(a) (“[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.”).
We thus turn to the surrounding statutory text to determine what forms of infringement outlined in § 271 support liabil *1356 ity under § 1337(a)(l)(B)(i).[1] See, e.g., Yates v. United States, — U.S.-, 135 S.Ct. 1074, 1081-82, 191 L.Ed.2d 64 (“Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words. Rather, ‘[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.’ ” Id. (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997))). Congress specifically limits § 1337(a)(l)(B)(i) to the “importation into the United States, the sale for importation, or the sale within the United States after importation....” It is objects which are imported or sold, not methods. As the Commission correctly ascertained in Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software, USITC Inv. No. 337-TA-724, 2012 WL 3246515, at *12-13 (Dec. 21, 2011) (Final), moreover, its focus under the statute must be on the point of importation, and patented methods generally are not directly infringed until their use in the United States after importation. Both “importation into the United States” and “sale for importation” identify the point of importation as the cornerstone of liability. Indeed, the use of present tense verbs in the statutory language, i.e. “importation” and “sale”, supports a natural reading of the statute — that infringement is tied, not just to a physical object, but to the date of importation. Cf. Carr v. United States, 560 U.S. 438, 462, 130 S.Ct. 2229, 176 L.Ed.2d 1152 (2010) (Alito, J., dissenting) (“Congress’s use of the present tense, is unambiguous, and the statutory language accordingly should be the end of the matter.”).
The exceptions to this importation-centric rule are specified in § 1337(a)(l)(B)(i) and § 1337(a)(l)(B)(ii). “[T]he sale within the United States after importation” in § 1337(a)(l)(B)(i) raises considerations of post-importation conduct, but Congress specifically limited this to “sale”, which does not apply to methods. We have long held that “use” in § 271(a) covers infringement of method claims. NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1319 (Fed.Cir.2005) (“Congress has consistently expressed the view that it understands infringement of method claims under section 271(a) to be limited to use.”). But “use” appears nowhere in § 1337(a)(1)(B)®. We expect that Congress speaks in precise terms when defining liability, and the absence of “use” in § 1337(a)(1)(B)® is highly conspicuous. Section 1337(a)(l)(B)(ii) expressly covers importation of products made using infringing processes prior to importation. The need to include § 1337(a)(1)(B)(ii) demonstrates that Congress did not intend for § 1337(a)(1)(B)® to extend beyond tangible “articles” to intangible methods, *1357 particularly where future infringement of such methods is uncertain at the time of importation. Congress identified the situations where our focus should .leave the point of importation, and the majority errs in grafting “use” into the language of the statute where it does not appear.
This makes practical sense; there is no actual harm to a patentee until an infringing use, and that harm only occurs after importation for method claims such as the ones at issue in this appeal. This is especially true for staple goods like Suprema’s scanners, where a broad assertion of the Commission’s power could prevent non-infringing goods from entering the country on the basis of what a customer may do with that item once it enters U.S. territory. Such considerations are the purview of the district courts, and fall outside the limited statutory jurisdiction of the Commission.
The Commission and the majority instead rely on an inducement theory under § 271(b). But as the Supreme Court recently reminded us, “our case law leaves no doubt that inducement liability may arise ‘if, but only if, [there is] ... direct infringement/” Limelight Networks, Inc. v. Akamai Techs., Inc., — U.S.-, 134 S.Ct. 2111, 2117, 189 L.Ed.2d 52 (2014) (quoting Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961)). Evidence of direct infringement — that all claimed steps of the method have been performed — is a predicate for a finding of inducement liability under § 271(b). When the Commission attempts to enforce an exclusion order under § 1337(a)(l)(B)(i) on grounds that Oil importer or customer may later complete steps of a method claim post-importation, a necessary predicate of § 1337(a)(1)(B)© is missing — there are no “articles that — infringe” because there is no infringement. Although the importer’s specific intent to cause infringement may exist at the time of importation (a point Suprema contests here), the “articles that-infringe” do not. The Commission would have the power to institute an exclusion order under § 271(b) if, at the time of importation, there was evidence of both specific intent and the existence of an article that itself directly infringed. See, e.g., Kyocera, 545 F.3d at 1346. But in that situation, the Commission could also justify the exclusion order on the basis of § 271(a). As we have described, however, the opposite is not true— § 1337(a)(1)(B)© does not permit the Commission to institute an exclusion order solely on § 271(b) when there is no direct infringement at the time of importation.[2]
Congress did not, in either § 1337(a)(1)(B)© or § 271, grant the Commission the power to issue an exclusion order on the basis of the importer’s intent to induce possible infringement after importation. If Congress had sought to grant the Commission the power to issue an exclusion order based on an importer’s intent to cause direct infringement at a later time, it would have said so. Congress could have used language similar to the “unfair methods of competition and unfair acts” language of § 1337(a)(1)(A), broadly sweeping in such an intent to induce infringement. Instead, in 1988, Congress defined prohibited acts related to patent infringement in § 1337(a)(1)(B)® *1358 through a categorical approach that does not include the possibility of post-importation infringement of method claims. Omnibus Trade & Competitiveness Act of 1988, Pub.L. No. 100-418, tit. I, 102 Stat. 1211-12. We are not at liberty to impute power to the Commission that Congress did not grant.
By permitting indirect infringement liability at the point of importation when there has been no direct infringement, the majority crafts patent policy where it believes there is a loophole ripe for abuse. See Maj. Op. at 1351-52. As the Supreme Court recently reminded us, however, “[t]he courts should not create liability for inducement of non-infringing conduct where Congress has elected not to extend that concept.” Limelight, 134 S.Ct. at 2118. As discussed later, moreover, the majority creates the possibility for an alternative type of abuse — or at least unnecessary confusion. As the Commission concedes, its exclusion orders are enforced at the border by Customs agents. Thus, Customs agents are charged with deciding which scanners may later be used by some Suprema customers in an infringing manner and, as to those, for which customers Suprema has acted with an improper intent to induce that infringement. Thus, although the majority states in its first footnote that scanners going to customers other than Mentalix are not relevant to the issue before us, Maj. Op. at 1341-42 n. 1, that is not the case.
The language of the statute is unambiguous — the Commission lacks the power under § 1337(a)(l)(B)(i) to enter an exclusion order on the basis of infringement of a method claim when the underlying direct infringement occurs post-importation.
II. The MajoRity’s Constkuction
The majority, the appellees, and the government read § 1337(a)(l)(B)(i) differently. They argue that the in rem nature of the Tariff Act and the in personam nature of the Patent Act are inherently incompatible. Maj. Op. at 1346-48. Because, they say, only a person, and not an article, can infringe, the majority reasons that the combination of § 1337(a)(l)(B)(i) and § 271 is necessarily ambiguous, and we must therefore defer to the Commission’s reasoned interpretation of the Tariff Act under Chevron.[3] Maj. Op. at 1346-47. The majority also focuses on the history of the Tariff Act and statements made in the legislative record, arguing that a 1988 amendment to the Tariff Act ratified a consistent pre-amendment application of § 271(b) to method claims under § 1337(a)(l)(B)(i). Neither of these justifications is compelling.
A. The Lack of Ambiguity
The majority’s presumed ambiguity in the combination of § 1337(a)(1)(B)© and *1359 § 271(b) seems to be merely a means to the end to which it arrives — resort to Chevron step 2. We should not read statutes to create an ambiguity in light of clear congressional statements, even if that result may lead to what some parties consider a normatively more fair result. See, e.g., United States v. Thompson/Center Arms Co., 504 U.S. 505, 524, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (White, J, dissenting) (“To conclude otherwise is to resort to ‘ingenuity to create ambiguity’ that simply does not exist in this statute.” (quoting Rothschild v. United States, 179 U.S. 463, 465, 21 S.Ct. 197, 45 L.Ed. 277 (1900))); cf. Antonin Scalia & Bryan A. Garner, Reading Law § 27 (2012) (“Hence there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.”) (hereinafter Scalia & Garner).
Section 1337(a)(l)(B)(i) speaks in terms of “articles that — infringe.” The majority says that this is not how we naturally refer to infringement under § 271 — that we normally think in terms of a person or entity doing the infringing. The majority claims that this “disparity” requires that the Commission, and not our court, resolve the “uncertainty.” Maj. Op. at 1346^47. This argument — newly asserted by the government in this en banc proceeding— lacks logical grounding. Although it is people who are liable for infringement under the law, it is the underlying article or methods that are the focus of an infringement analysis. It is to the aspects of articles that are manufactured, sold, or offered for sale or methods that are “used” that an element-by-element comparison with the patent claims is made. Multiple subsections of § 271 tie conduct directly to an article. For example, § 271(a) defines infringement as conduct involving the “makfing], us[ing], offering] to sell, or selling] any patented invention.” The “patented invention” of § 271(a) is the equivalent to the “article” in § 1337(a)(1)(B)®. In the one situation where this analogy breaks down — method claims — the Commission has not said that the statute is inexorably ambiguous, it has instead concluded that § 1337(a)(1)(B)® does not apply to post-importation conduct that infringes method claims. Certain Electronic Devices, 2012 WL 3246515, at *12. And, § 271(c) ties contributory infringement to conduct involving “a component of a patented machine, manufacture, combination or composition.” Similar to § 271(a), this “component” is the equivalent to the “article” in ■§ 1337(a)(1)(B)®.
Section 271(b) has no similar analogue. Induced infringement focuses on conduct tied to another infringer, not to an “article,” “patented invention,” or “component.” See 35 U.S.C. § 271(b) (“Whoever actively induces infringement of a patent shall be liable as an infringer.”). We have clarified that, in an induced infringement analysis, we focus on the conduct of the inducer and not the article itself. See DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1306 (Fed.Cir.2006) (en banc) (“[Inducement requires evidence of culpable conduct, directed to encouraging another’s infringement, not merely that the inducer had knowledge of the direct infringer’s activities.”); Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363 (Fed.Cir.2003) (“To succeed [on a theory of induced infringement], a plaintiff must prove that the defendants’ actions induced infringing acts and that they knew or should have known their actions would induce actual infringement.” (internal quotation marks and alterations omitted)). Any consideration of the “article” in an inducement analysis comes only as part of the requisite direct infringement under § 271(a). As discussed above, the Com *1360 mission has already concluded that § 1337(a)(l)(B)(i) does not premise liability on post-importation conduct found to infringe a method claim.
The fact that Congress spoke in terms of “articles” instead of “infringers” in § 1337(a)(l)(B)(i) is not evidence that Congress was confused or sought to implicitly delegate the decision of what an “article— that infringes” is to the Commission. King v. Burwell, — U.S.-, 135 S.Ct. 2480, 2488-89, 192 L.Ed.2d 483 (2015) (explaining that we should not nonchalantly defer to an agency’s interpretation for questions of “deep economic and political significance” (internal citation omitted)). It, instead, indicates Congress’s determination that Customs’s decision-making at the border should be tied to a tangible object — i.e., an “article” — not an intangible consideration — i.e., the importer’s intent. Although the Commission may be required to consider the importer’s intent in its analysis, it will only be as a corollary to a finding of direct infringement at the point of importation. Under § 1337(a)(l)(B)(i), intent cannot be divorced from the direct infringement. See Limelight, 134 S.Ct. at 2118 (explaining that separating § 271(b) from § 271(a) “would require the courts to develop two parallel bodies of infringement law: one for liability for direct infringement, and one for liability for inducement.”). The majority continues to “fundamentally misunderstand[ ] what it means to infringe a method patent.” Id. at 2117.
The majority counters that an unambiguous construction of the statute “to require that infringement occur at the time of importation” would produce “absurd results under the pre-1994 version of § 271(a),” because, pre-1994, § 271(a) did not define importing a patented invention as an infringing act. Maj. Op. at 1348. The majority, however, ignores that § 1337(a)(1)(B)® explicitly considers the “sale within the United States after importation,” which means that Section 337 would “have reached even garden-variety direct infringement” that occurs through infringing sales within the United States. Maj. Op. at 1348. Congress also amended § 271 in 1988 by adding § 271(g) to cover the importation of an article made by a patented process as an act of infringement. Omnibus Foreign Trade & Competitiveness Act of 1988, Pub.L. No. 100-418, § 9003, 102 Stat. 1107. And, the domestic industry was not without recourse, as it could still seek to invoke § 1337(a)(1)(A) as it had done before the 1988 Amendments because, under the majority’s interpretation, those articles would not have been “articles that — infringe” under § 1337(a)(1)(B)®. The 1994 Amendments to § 271, as part of the legislation necessary to effectuate the Uruguay Round Agreements, Uruguay Round Agreements Act, P.L. No. 103-466, 108 Stat 4809 (1994), demonstrate that Congress recognized the importance of clearly tying infringement to the point of importation, strengthening both the power of the district courts and the Commission explicitly. Even if the majority’s “absurd result” theory were true, moreover, we would still be required to give effect to the language Congress chose in 1988 to describe the Commission’s current power to control imports at the point of importation. See, e.g., Stone v. INS, 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995) (“When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.”); Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1367 (Fed.Cir.1998) (“A change in the language of a statute is generally construed to import a change in meaning....”).
*1361 “It is ... our task to determine the correct reading” of § 1337(a)(1)(B)® in light of § 271, and we cannot pass this task to the Executive Branch where Congress is unambiguous. Burwell, 135 S.Ct. at 2489. Congress provided the Commission with clear instructions: the Commission may bar the importation of any articles that could be found to be infringing under the Patent Act at the time of importation. See 19 U.S.C. § 1337(a)(1)(B)®. Claims of induced infringement predicated on the potential completion of all steps of a method claim after importing the’ article do not meet this requirement under the plain language of the statute. There is no need to rely on the Commission’s interpretation in light of the clear statutory language in § 1337(a)(1)(B)®.
B. Legislative History
Failing to find a clear statement in the language of the statute that would support their interpretation of § 1337(a)(1)(B)®, the majority relies on its own reading of the legislative history. Maj. Op. at 1349-52. Putting aside the extent to which rebanee on statements in legislative history have limited value when engaging in statutory interpretation, the history of the Tariff Act does not support the majority’s expansive interpretation of § 1337(a)(1)(B)®.
From its inception in 1916, the Commission administered a predecessor to modern § 1337. Section 316 of the 1922 Tariff Act declared that “unfair methods of competition and unfair acts in the importation of articles into the United States ... the effect or tendency of which is to destroy or substantially injure an industry ...” were unlawful. Ch. 386, 42 Stat. 858, 943 (1922). This presumably included patent infringement as an “unfair method of competition” or an “unfair act.” See, e.g., Frischer & Co. v. Bakelite Corp., 17 C.C.P.A. 494, 39 F.2d 247, 257 (1930). Congress reenacted § 316 as § 337 in the Tariff Act of 1930. Pub.L. No. 71-361, § 337, 46 Stat. 590, 703-04 (1930). Similar to § 316, § 337 stated that “[ujnfair methods of competition and unfair acts in the importation of articles into the United States ... the effect or tendency of which is to destroy or substantially injure an industry ...” were unlawful. Id.; see also In re Orion Co., 22 C.C.P.A. 149, 71 F.2d 458, 463 (1934) (explaining that § 316 of the Tariff Act of 1922 “was the prototype of section 337 of the Tariff Act of 1930, and is, in substance, the same”). Unsurprisingly, our predecessor court held that the prohibition on “unfair method[s] of competition” or “unfair act[s]” in § 337 also applied to patent infringement. Orion, 71 F.2d at 464-65.
Section 337 remained largely unchanged until 1988, when Congress substantively amended the Tariff Act to its present form. Omnibus Foreign Trade & Competitiveness Act of 1988, Pub.L. No. 100-418, 102 Stat. 1107. In § 1342 of the Act, Congress amended § 337 to split the analysis of “unfair methods of competition and unfair acts.” Under § 1337(a)(1)(A), an exclusion order based on general unfair methods of competition and unfair acts required a finding of substantial injury to the industry, as in the 1922 and 1930 Acts, but under § 1337(a)(1)(B), an exclusion order predicated on the importation of “articles that — infringe” no longer required a showing of substantial injury to the industry. Id. § 1342, 102 Stat. at 1212. Thus, in 1988 Congress explicitly created a limited exception for imports that violated patent rights by removing the requirement of proving a substantial injury to the domestic industry. But it did not remove the focus on “articles” that was present in the 1922 and 1930 Acts; it reinforced it.
*1362 The majority and the government rely too heavily on very general statements in the legislative history of the 1988 Act when they claim that Congress somehow meant in that Act to authorize the Commission to base exclusion orders on any possible injury to domestic industry. In particular, the majority fails to explain why, if there had been a consistent Commission practice regarding exclusion orders predicated solely on an intent to induce infringement as they claim, and the only substantive change to § 1337(a)(1)(B) was removing the domestic injury requirement, Maj. Op. at 1351, Congress adopted the “articles that — infringe” moniker. Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (“In construing a statute we are obliged to give effect, if possible, to every word Congress used.”).
The majority and the government point to a portion of the 1988 Amendments discussing congressional fact-findings in support of their argument that Congress intended that § 1337(a)(1)(B) maintain a broad scope. Maj. Op. at 1351-52 & n. 7 (referring to this language as “consistent with Congress’ longstanding broad policy, with its broadening purpose”). Section 1341 of the 1988 Act, titled “Findings”, states that “the existing protection under section 337 of the Tariff Act of 1930 ... is cumbersome and costly and has not provided United States owners of intellectual property rights with adequate protection. ...” 102 Stat. at 1211-12. And, the majority references statements in the House Reports explaining that the purpose of the 1988 amendments was to strengthen the Tariff Act and make it more effective. Maj. Op. at 1351-52 (citing H.R.Rep. No. 100-40, at 155 (1987) and H.R.Rep. No. 100-576, at 112 (1988)). Similarly, the government cites language from the Senate Report, to support the argument that the 1988 Amendments were intended to “strengthen” the enforcement of patent rights. Br. of Int’l Trade Comm’n at 13 (citing S.Rep. No. 100-71, at 128 (1987)). These statements, however, do not imply that Congress intended for § 1337(a)(1)(B) to cover claims of induced infringement at the time of importation when the requisite direct infringement would not occur until after importation and might never occur at all.
Rather, by removing the domestic injury requirement for exclusion orders based on patent infringement, Congress eliminated one of the most “cumbersome and costly” aspects of seeking an exclusion order— proof of substantial injury to the domestic industry. 102 Stat. at 1211-12. Thus, all the statements to which the majority and government point regarding the need to strengthen protection of domestic patent rights point to the elimination of the substantial injury to domestic industry requirement; they do not justify the conclusion that Congress intended to imbue the Commission with the authority to do whatever it thinks will provide the broadest protections to patentees, regardless of its statutory charge. Statements in the legislative history should not be used to create ambiguity in an already clear statute, especially not legislative history that is as vague as that relied on by the majority here. See Milner v. Dep’t of Navy, 562 U.S. 562, 572, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) (“We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language”). Congress strengthened the power of patent holders to assert their rights, not by expanding § 271, but by removing a procedural hurdle under § 1337(a).
C. Historical Commission Practice
The majority and the government also assert that the statutory and legislative *1363 history supports its interpretation by demonstrating Congress’s intent to continue an unbroken practice by the Commission of predicating exclusion orders on acts of induced infringement. Maj. Op. at 1349- 51. Specifically, it states that “Congress has not upset the Commission’s consistent interpretation of Section 337.” Maj. Op. at 1351. There has been no interpretation of § 337 that mirrors that adopted by the majority today, however, and certainly nothing so clear that Congress should be charged with jumping in to stop it. The cases the majority cites to support the sweeping statements it makes about the Commission’s unbroken practices do not bear the weight placed on them. Indeed, the government conceded as much at oral argument. See Oral Argument at 1:12-1:13, Suprema, Inc. v. International Trade Comm’n, No. 12-1170 (en banc), available at http://oralarguments.eafc.uscourts.gov/ default. aspx?fi=2012-1170_252015.mp3.
The majority cites a single pre-1988 case in support of its “consistency theory”: Young Engineers, Inc. v. U.S. International Trade Commission, 721 F.2d 1305 (Fed.Cir.1983).[4] Young Engineers did not involve an exclusion order predicated exclusively on a finding of induced infringement. The Commission issued an exclusion order both because of a finding of direct infringement due to the importation of an infringing product, and induced infringement on the basis of the importer providing “training and assistance to [] customers in the use of the inserts in accordance with the patented methods.” In re Certain Molded-in Sandwich Panel Inserts and Methods for Their Installation, USITC Inv. No. 337-TA-99, 218 U.S.P.Q. 832, at *5, 1982 WL 61887 (April 9, 1982), aff'd, Young Eng’rs, 721 F.2d at 1317. The Commission also concluded that the inserts at issue were not staple goods, and justified the exclusion order on a finding of contributory infringement. Id. We affirmed those findings without analysis of the Commission’s power to justify exclusion orders solely on a finding of induced infringement. Young Eng’rs, 721 F.2d at 1317. Young Engineers does not evidence that we have “consistently affirmed the Commission’s determination that a violation of Section 337 may arise from an act of induced infringement.” Maj. Op. at 1351. At best, Young Engineers and Bakelite, see supra note 4, stand for the uncontroversial premise that the Commission can exclude either: (1) articles made using a patented method overseas pre-importation; or (2) non-staple goods imported into the United States on the basis of a finding of direct and induced infringement. In either situation, a Customs agent is not required to divine the *1364 importer’s intent to determine if there would be a potential downstream direct infringement. The direct infringement either already occurred prior to importation (and is statutorily covered under § 1387(a)(l)(B)(ii)) or the good itself could not be used in a non-infringing manner. This is a far cry from establishing a consistent agency practice of which Congress necessarily would have been aware in 1988, as the majority proclaims. Maj. Op. at 1349-51.
Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co., 754 F.2d 345 (Fed.Cir. 1985) does not alter this analysis. In Standard Oil, we analyzed when the period for laches would begin to run for claims of induced infringement: at the time of the direct infringement or at the time of the inducing act. Id. at 348-49. We concluded that laches barred recovery because the specific intent to induce existed prior to the six-year period for laches, even though the subsequent direct infringement occurred during the laches period. Id. Standard Oil does not annunciate a rule that induced infringement occurs at the time of the inducing act, see Maj. Op. at 1349 —we held instead that, once the direct infringement occurs, the liability for induced infringement is traced back to the inducing act. Id.; see also Nat’l Presto Indus., Inc. v. W. Bend. Co., 76 F.3d 1185, 1196 (merely holding that there must be a direct infringement for liability under § 271(b) to exist). Nothing in Standard Oil alters the fact or requirement that there must be an underlying direct infringement for there to be induced infringement. Limelight, 134 S.Ct. at 2117.
There is simply no evidence of any pre-1988 Commission practice equivalent to the Commission’s actions here. Even if reliance on congressional silence were ever a strong reed upon which to premise statutory interpretation,[5] the majority cannot rely on Congress’s purported desire to continue a consistent past agency practice to bolster its statutory construction when the only consistent agency practice was the agency’s failure to assert § 337 against importers of staple goods based solely on the intent to induce infringement of method claims post-importation.
D. Modern Commission Practice
Our post-1988 case law provides no better support for the majority’s interpretation. Although it is unclear which cases the majority believes supports its view, as it cites only two in passing, the government points to two cases that they argue demonstrate the Commission’s reliance on § 271(b) in an exclusion order: Alloc, Inc. v. International Trade Commission, 342 F.3d 1361 (Fed.Cir.2003), and Kyocera Wireless Corp. v. International Trade Commission, 545 F.3d 1340 (Fed.Cir.2008). Br. of Int’l Trade Comm’n at 33 n. 8. But neither case required us to determine if an exclusion order could be predicated solely on an intent to induce infringement.
In Alloc, the Commission found no infringement, either direct or indirect, in imported flooring products, and we af *1365 firmed that determination. 342 F.3d at 1366-68, 1375. After construing the claims at issue, we agreed with the Commission that there was no evidence of direct infringement. Id. at 1373. As for induced infringement, we noted that the basis for the allegation of inducement was installation instructions included in the packaging at the time of importation. Id. at 1373-74. In a short discussion of induced infringement, we found “no reason to disturb the administrative judge’s conclusion on inducement” specifically because “the administrative judge found no evidence of direct infringement.” Id. at 1374. Alloc does not demonstrate our approval of the Commission’s use of induced infringement to justify the exclusion order in the circumstances here, however; our silence there was not nearly as deafening as the government believes. That case did not involve uncertainty as to future infringement, and there was no challenge to the Commission’s authority regarding inducement claims. At best, we merely overlooked this issue in our analysis, and “I see no reason why [we] should be consciously wrong today because [we were] unconsciously wrong yesterday.” Massachusetts v. United States, 333 U.S. 611, 639-40, 68 S.Ct. 747, 92 L.Ed. 968 (1948) (Jackson, J., dissenting); cf. Vizio, 605 F.3d at 1343 (declining to analyze the Commission’s authority to base an exclusion order on induced infringement because “[appellants do not challenge the Commission’s finding of infringement”); see also Maj. Op. at 1352 (“Prior to this case, none of our reviews of the Commission’s determinations have questioned the Commission’s authority to investigate and find a violation of Section 337 predicated on an act of induced infringement.”).
Kyocera also fails to provide any support for an interpretation of § 1337(a)(1)(B)® that would include induced infringement of method claims for potential post-importation direct infringement. Similar to Alloc, there was no challenge to the Commission’s authority regarding induced infringement allegations; we assumed without deciding that an exclusion order could be predicated on a finding of induced infringement under § 1337(a)(1)(B)®. Kyocera, 545 F.3d at 1353-54; see also ERBE Elektromedizin GmbH v. Int’l Trade Comm., 566 F.3d 1028, 1037 (Fed.Cir.2009) (affirming Commission’s determination of no direct infringement, and therefore concluding there was “no basis for finding induced or contributory infringement,” without analyzing the Commission’s authority under § 1337(a)(1)(B)® to enter an exclusion order due to induced infringement). Our only discussion of induced infringement involved a short statement remanding the case to the Commission to perform the correct analysis under § 271 after we had altered the specific intent analysis in DSU. Kyocera, 545 F.3d at 1354. Importantly, our appellate review in Kyocera did not involve allegations of inducement predicated on potential post-importation direct infringement. See In the Matter of Certain Baseband Processor Chips and Chipsets, Transmitter & Receiver (Radio) Chips, Power Control Chips, & Products Containing Same, USITC Inv. No. 337-TA-543, 2006 WL 3920334, at *74 (Oct. 10, 2006) (finding that Qualcomm “induces infringement of the apparatus claims” of U.S. Patent No. 6,714,983, but that “Broadcom has not proved that Qualcomm induced infringement of the method claims of the '983 patent”).
To the contrary, Kyocera involved the importation of wireless devices that were programmed to operate in an infringing manner prior to being imported. Id. at *1366 1346 (noting that the Commission only excluded devices from manufacturers who “purchase[d] and incorporated Qualcomm chips into their mobile wireless devices outside the United States, and then imported them into the United States for sale”). Although the Commission relied on an induced infringement theory for infringement of apparatus claims, the imported articles directly infringed at the time of importation. They were the quintessential “articles that — infringe.”
Judge Reyna, in his dissent to the panel opinion, highlighted a series of Commission decisions allegedly involving exclusion orders based on an intent to induce direct infringement after importation. Suprema, Inc. v. Int’l Trade Comm., 742 F.3d 1350, 1372 n. 2 (Fed.Cir.2013). The majority, as well, appears to rely on those cases through incorporation by reference. Maj. Op. at 1350-51 n. 6 (listing examples and. referencing footnote 2 of the dissent to the panel decision). But like Kyocera and Al-loc, none of these cases involved a determination by this court that the Commission had the authority to base an exclusion order solely on a finding of an intent to induce possible later infringement. In fact, in each of these cases, the Commission also found direct or contributory infringement at the time of importation.[6] None demonstrate a Commission practice consistent with the majority’s interpretation. The government, the Commission, and the majority remain unable to point to any example of the Commission excluding staple goods on the basis of a theory of inducement of direct infringement of method claims post-importation prior to this appeal.
Congress did not intend for Customs agents to need to decipher an importer’s intent to induce infringement at some later date. It, instead, avoided such an unworkable construct by requiring the Commission to issue exclusion orders based on the infringing nature of the article itself. Pri- or Commission practice, either pre- or post-1988, lends no support to a contrary view. Though we need not reach the legislative history or past Commission practice to perform our duty of saying what the law is for unambiguous statutory language, I am unconvinced that any of the “evidence” upon which the majority relies alters a fair reading of the language that a majority of both houses of Congress agreed to: “articles that — infringe.” Indeed, I believe it supports the unambiguous reading that the panel majority found in that statutory language.
E. Equitable Considerations
The crux of the majority’s holding is equity, and the industry’s concern that the plain language of the statute might leave a porous border hospitable to infringers. See, e.g. Maj. Op. at 1344, 1351-52. But that concern is best addressed to Congress, who chose the words we are interpreting today. The majority minimizes— or ignores — both the power already avail *1367 able to the Commission and the importance of the other source of relief for the domestic industry: district courts.
Behind the majority’s strained statutory interpretation is a belief that any construction of § 1337(a)(l)(B)(i) that reduces the Commission’s authority to institute exclusion orders would negate the flexibility built into the Tariff Act for remediating harms against the domestic industry. See Maj. Op. at 1352 (“There is no basis for curtailing the Commission’s gap-filling authority in that way.”). The majority claims that, under the broad language of the Tariff Act, the Commission must have the necessary authority to halt importation of all even potentially infringing goods'in order to effectuate Congress’s intent in enacting § 1337(a)(l)(B)(i). Id. The amici also highlight that, in combination with the Commission’s decision not to entertain complaints of direct infringement of method claims under § 271(a), Certain Electronic Devices, 2012 WL 3246515, at *12-13, the dissent’s construction would render the Commission largely toothless to stop infringement of method patents. See, e.g., Amicus Br. of Intellectual Prop. Owners Ass’n at 4.
These concerns are overstated. There is little evidence' that the Commission would be impotent to stop such importers. The plain language of the statute would not prevent the Commission from predicating an exclusion order on, for example, a non-staple item. This construction also would not prevent the Commission from excluding goods that directly infringe at the point of importation. The Commission has a rich historical practice of excluding such goods, and the “articles that — -infringe” language does not diminish the Commission’s power. The language of the statute only denies the Commission the power to issue an exclusion order solely on the very limited factual scenario envisioned here — allegations of induced infringement of a method claim based on potential post-importation direct infringement. This interpretation would not open a porous border for all kinds of nefarious actors. At worst, it would limit the Commission’s ability to address a situation that has never arisen prior to the present appeal. Our recency bias should not force us to depart from our traditional role in statutory interpretation due to concerns that may or may not ever present themselves again. It certainly should not serve as a justification to abdicate to the Executive all authority over interpretation of § 1337(a)(l)(B)(i).
This desire to give the Commission free rein to prevent potential abuses highlights a more fundamental Poncern with the majority’s approach. The Commission is a creature of statute, with its powers narrowly defined by Congress. Kyocera, 545 F.3d at 1355. The Commission is also entirely at the whim of the President (through the United States Trade Representative), who can choose to set aside an exclusion order before it is enforced. 19 U.S.C. § 1337(j)(2). The Commission is therefore subject to the control of the Executive Branch, even though the Commission is nominally an independent agency with three commissioners from each political party that are appointed by the President upon the advice and consent of the Senate. Congress strictly defines the powers of the Commission, but the President has veto powers over the Commission’s assertions of power under § 1337. It is within this framework that we must ardently guard Congress’s power to establish the law and our.own power to “say what the law is.” Marbury v. Madison, 5 U.S. (1 Crunch) 137, 177, 2 L.Ed. 60 (1803).
*1368 The majority, however, too easily defers to the Com-mission’s interpretation. By concluding that the statute is ambiguous, the majority emboldens the Executive at the expense of both Congress and this court. As long as we defer to the Commission’s interpretation of § 1337, that interpretation may change when the Administration changes. The value and importance of stare decisis in statutory interpretation is weakened by undue resort to Chevron. Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) (“[T]he consistency of an agency’s position is a factor in assessing the weight that position is due.”). The Commission no longer becomes a “creature of statute,” but instead a creature of its own making, an ever-expanding hydra that can sprout new areas of authority with each new interpretation.
The majority nominally defers to the Commission because it finds that the statute is ambiguous due to the interplay of § 1337 and § 271(b), even though the language of § 1337 is clear on its face. Maj. Op. at 1345-48. But the majority agrees with the Commission in part because it believes the Commission’s interpretation will prevent the narrow set of abuses described above. Maj. Op. at 1351-52. The industry should address its concerns with potential holes in the statute to Congress, not the Commission or the courts. By choosing to fix the purported mistake made by Congress in using “articles that— infringe”, the majority oversteps its role, and at the same time weakens that of Congress.
Finally, we must not forget that there is a forum that can provide an appropriate remedy for allegations of induced infringement of method claims based, on post-importation direct infringement: district courts. District courts can enter injunctions preventing downstream customers from using the article in an infringing manner. 35 U.S.C. § 283 (“The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent ....”). And, unlike the Commission, a district court could award damages for such acts of inducement. Id. § 284.
The Commission is an alternative to district courts that acts to supplement the powers of district courts, not a substitute for district courts when the district court is not as convenient a forum or the remedy sought is more difficult to obtain. Indeed, as noted previously, the Commission itself has determined that it does not have power over allegations of direct infringement of method claims at the point of importation. Certain Electronic Devices, 2012 WL 3246515, at *12-13. This does not mean those allegations can never be heard, they just must be addressed before a district court. Similarly here, § 1337(a)(1)(B)® does not grant the Commission power to address assertions of induced infringement of method claims based on post-importation direct infringement. Those claims are not lost forever, they just must be asserted in district court.
Finally, the majority’s interpretation of § 1337(a)(1)(B)® is not the catholicon it purports to be. Although it will permit the Commission to premise exclusion orders on claims of induced infringement based on threats of post-importation direct infringement, it will also grant the Commission the power to hold up staple goods. By premising Customs’s power to exclude goods on the importer’s alleged intent for *1369 how the goods may be used, goods that can be used in both infringing and non-infringing ways likely will be denied entry based on the perception that they could be used to infringe a method claim, especially considering the broad deference given to Customs agent’s decision-making at the border. See, e.g., Amicus Br. of Dell at 22 (citing the deference generally given to Customs agents in enforcing an exclusion order, such as the one issued in the present case, at the border). If those goods are not ultimately used in an infringing manner, the Commission would be acting beyond its powers under the Tariff Act. But that determination cannot be made until the goods have been imported, absent evidence that the goods are non-staple items or that the goods are intended to be used only in an infringing manner. A certification statement by the importer will not solve this problem because any evidence that a customer uses the goods in an infringing manner later, even if unexpected, would trigger concerns that could justify an exclusion order or subject' the importer to the threat of severe sanctions. The weighing of competing concerns created by the majority’s construction demonstrates why it is Congress, and not our court and certainly not the Commission, which is in the best position to determine the Commission’s powers. Congress has made that determination, limiting those powers to “articles that — infringe.” That decision may make the domestic industry, and some members of this court, uncomfortable, but that is a debate best left for the branch of our government that should be most amicable to the concerns of industry: Congress.
III. CONCLUSION
The plain language of § 1337(a)(1)(B)® reveals that Congress did not grant the Commission the power to issue an exclusion order based solely on a finding of induced infringement of a method claim and potential post-importation direct infringement. Neither ambiguous statements from the legislative history nor vague and non-determinative prior Commission statements detract from this analysis. The majority’s attempt to shoehorn the language of § 1337(a)(1)(B)® into a strained interpretation of the statute under the guise of deferring to the Commission’s interpretation may prevent some rare potential abuses of our patent system, but the majority also opens Pandora’s Box. The majority refers to the original panel interpretation as a “technical interpretation,” Maj. Op. at 1352, but it should more appropriately be coined “the interpretation mandated by Congress.” Our system of separation of powers guarantees that Congress enacts the laws and we interpret those laws. The majority here harms both of these aims: it diminishes Congress’s power to define the scope of the Commission’s authority, and it permits the Executive Branch to say what the law is. For these reasons, I respectfully dissent from the majority’s interpretation of § 1337(a)(1)(B)®.

. The majority asserts that Suprema failed to demonstrate a “clearly established usage" of "articles that — infringe” “limited to product claims or to direct or contributory infringement." Maj. Op. at 1347-48. The plain language of the statute is all that is necessary to determine its meaning. Indeed, the Commission itself has limited the scope of “articles that' — infringe” with regard to direct infringement of method claims, relying on die statute and common parlance, without reference to "clearly established usage” of "articles that— infringe.” See Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software, USITC Inv. No. 337-TA-724, 2012 WL 3246515, at *12-13 (Dec. 21, 2011). Loose phraseology in our prior opinions does not change the words Congress explicitly chose in § 1337(a)(l)(B)(i).

. Thus, even though this court has used the term "infringement” to generically describe any acts under § 271, Maj. Op. at 1346 (citing Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336 (Fed.Cir.2001)), that usage does not somehow alter how we should interpret "infringe” within the context of the statutory scheme of § 1337.

. The majority does not argue that the use of "articles” in § 1337(a)(l)(B)(i) is so fundamentally incorrect or creates such unanticipated results as to trigger the absurdity doctrine. See, e.g., United States v. Kirby, 7 Wall. 482, 74 U.S. 482, 486-87, 19 L.Ed. 278 (1868). The majority instead appears to be arguing that § 1337(a)(l)(B)(i) is ambiguous in this particular situation because the application of § 271(b) to post-importation conduct does not provide for a clean analogue under § 1337(a)(l)(B)(i). Maj. Op. at 1346 ("Simply put, the phrase 'articles that infringe’ does not map onto the Patent Act's definition of infringement.”). This purported inconsistency does not prove that Congress intended to leave the interpretative decision to the Commission, it merely demonstrates congressional intent not to include such conduct under the scope of § 1337(a)(l)(B)(i). FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

. The government relies heavily on Frischer & Co. v. Bakelite Corp., 17 C.C.P.A. 494, 39 F.2d 247 (1930), to establish that the Commission had previously based exclusion orders on induced infringement. See, e.g., Br. of Int'l Trade Comm'n at 28-30, 32. Bakelite does not stand for what the government claims, however. The exclusion order in Bakelite was predicated on a finding that the imported articles were "prepared and manufactured in conformity” with the patented methods before being imported, which is consistent with the later-enacted prohibition on goods produced using patented methods prior to importation in § 1337(a)(l)(B)(ii). Id. at 507; see also In re Orion, 71 F.2d at 466-67 (finding that the import of products produced using infringing methods abroad could be considered an unfair method of competition or unfair act under the Tariff Act of 1930). Bakelite simply does not stand for the proposition that an exclusion order can be issued on the basis of induced infringement where the underlying direct infringement of a method claim occurs after importation, and might not occur at all. Unsurprisingly, the majority does not even attempt to rely on Bakelite.

. The Supreme Court has recognized that, absent circumstances not present here, congressional silence is, at best, a tenuous ground upon which to justify a particular statutory construction. See Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 749, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("Ordinarily, 'Congress' silence is just that — silence.”) (quoting Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987)); Johnson v. Trans. Agency, 480 U.S. 616, 672, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting).

. See, e.g., Certain Semiconductor Chips Having Synchronous Dynamic Random Access Memory Controllers and Prods. Containing Same, Inv. No. 337-TA-661, USITC Pub. 4266, 2011 WL 6017982, at *80-84 (Jan. 22, 2010) (also finding direct and contributory infringement at point of importation); Certain Automated Mechanical Transmission Sys. for Medium-Duty and Heavy-Duty Trucks and Components Thereof, Inv. No. 337-TA-503, USITC Pub. 3758, 2007 WL 4473082, at *98-101 (Aug. 1, 2007) (also finding direct infringement at point of importation); Certain Hardware Logic Emulation Systems and Components Thereof, USITC Inv. No. 337-TA-383, 1997 WL 665006, at *63-88, 92-99 (July 31, 1997) (also finding direct and contributory infringement at point of importation).